## HAZELTINE CORPORATION v. WILDERMUTH.*

Circuit Court of Appeals, Second Circuit.
July 1, 1929.

No. 322.

Charles Neave and Stephen H. Philbin, both of New York City (Cornelius D. Ehret, of Philadelphia, Pa., of counsel), for appellant.

*For opinion on motion to reopen proofs, see 35 F.(2d) —.

636

William H. Davis, of New York City (R. Morton Adams, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge. Appellee sues for infringement of patent No. 1,533,858, granted April 14, 1925, to Hazeltine. Claims 1, 2, 5, 9, 11, 12, 14, and 16 are relied upon. The appellant, a dealer, is a purchaser from the Atwater Kent Manufacturing Company of four types referred to as models 20, 30, 32, and 35, which have all been held to infringe the patent. The patent relates to the control of undesired regenerative effects, especially oscillation, by means of neutralizing circuits.

In the radio tube operation, as an amplifier of either radio or audio currents and of regenerative amplification, the incoming energy is transferred to the grid circuit of the tube, usually by a transformer, comprising a primary coil and a secondary coil. The filament, heated by the battery, emits electrons, which go from the negative filament to the positive plate. The grid circuit is also called the input. The output circuit includes a battery, and is completed through the tube by the electron stream, between filament and plate, called a plate circuit. The voltage variations on the grid, due to the incoming signal, act as a valve to decrease and increase the electron stream correspondingly. Consequently, the plate current is similarly decreased and increased, resulting in alternating currents or pulsations in the plate circuit. The grid variations are repeated thereby in the plate circuit in amplified form, because of the power of the battery in that circuit. The tube may also act as a detector or rectifier. The plate circuit having a local source of voltage and current, the plate is usually of higher potential—that is, greater electrical pressure —than the grid circuit. Energy will flow back from the higher potential plate circuit to the grid circuit, if the two circuits are coupled. Such coupling may be direct (conductive), magnetic (inductive, as by a transformer), or capacitive (electrostatic, as by a condenser). Any part of the plate circuit near any part of the grid circuit will transfer energy through space, either magnetically or electrostatically. A wire between the plate circuit and the grid circuit would be a direct coupling. A coupling between the plate circuit and the grid circuit is furnished by the capacity existing in the tube between the grid and the adjoining plate.

All couplings, other than the internal coupling of the three-electrode tube, can be eliminated. The coupling external to the tube may be eliminated by sufficiently separating the external portions of the grid circuit from the external portions of the plate circuit, or by shielding one circuit from the other. The internal coupling, the grid plate capacity, cannot be eliminated by separation or shielding, and other means must be employed for controlling its reaction. The alternating energy, fed back from the plate circuit to the grid circuit, may be in step with the alternating energy in the grid circuit, in which event the latter is increased or supplemented. This is termed "regeneration." If the feed-back energy is out of phase, the grid circuit energy may be opposed and decreased. This is termed "degeneration" or counter feed back. The phase depends upon the values of the inductance and capacity in the circuits. Regeneration can increase greatly the normal amplifying powers of the tube to the point where the natural losses of the circuits are overcome and oscillation occurs, which produces howls or whistles. The production of oscillations is valuable in transmitting. The locally produced oscillations may be used in reception, to pick up weak signals.

It is desirable to avoid uncontrollable regeneration in receivers—such as would result in oscillations interfering with the reception of signals. Controlled regeneration is used in receivers, both for increased amplification and to aid in picking up weak signals.

This patent has to do with the control of regeneration through plate circuit neutralization. It is a specific method of eliminating the undesirable effects of regeneration in audion amplifiers. Claims 1, 2, and 5 describe broadly the method of arrangement of plate circuit neutralization of the inherent and unavoidable capacity coupling between the grid and the plate circuits of an audion. Claims 9, 11, 12, 14, and 16 describe in several ways the combinations in a multistage amplifier. This patent is a division of the copending application, serial No. 433,729, filed December 28, 1920, patent No. 1,489,228, issued April 1, 1924. Claim 1 provides:

"The method of neutralizing capacity coupling between the grid and plate circuits of an audion having a transformer in the plate circuit which consists in capacitively coupling the grid of said audion and a secondary of said transformer to cause equal capacity currents to flow to and from the grid whereby such current is prevented from flowing between the grid and the filament system."

Claim 2 is of the same scope as claim 1, the invention being defined in that claim as an

electric circuit arrangement for neutralizing capacity coupling instead of a method for so doing. Claim 5 is more specific in defining "the means for capacitively coupling the grid of the said audion and a secondary of said transformer," and claim 2 as a "coil connected between the plate and the filament system and an auxiliary coil and a neutralizing capacity connected in series between the grid and the filament system, said coils and said neutralizing capacity being so proportioned," etc. Claims 9, 10, 11, 12, 14, and 16 define a combination of electrical elements in a multistage amplifier, constituting the application of the inventor's plate circuit neutralization to one or more stages of a multistage amplifier.

The plate circuit of the audion comprises the elements connected between the plate and filament and the grid circuit comprises those elements connected between the grid and the filament. The patent points out that capacity coupling between the grid and the plate circuits of the audion may result in the production of oscillations. In some cases such oscillations are desired, but in other cases, particularly in the amplifiers, such oscillations are not desirable as they may completely mask the signals which it is desired to amplify.

The patents to Hartley (1916) and to Rice (1920) preceded Hazeltine in neutralization of the audion circuits. We considered both of these in Radio Corporation of America v. Twentieth Century Radio Corporation, 19 F.(2d) 290, and held both patents valid and infringed. We pointed out that Hartley's apparatus comprised the auxiliary circuit, including the coil shown in Figs. 1 and 2 of his patent, and that thereby radio frequency energy was taken from the plate circuit, reversed in direction, and transferred to the grid circuit by means of a magnetic coupling there shown. The energy thus fed back opposed the energy fed through the tube by means of the plate and grid. We said that the invention comprised the prevention of oscillations by transferring from the plate circuit to the grid circuit by a path around the tube an electromotive force to oppose that caused by internal coupling of the tube. The specific arrangement employed a neutralizing path around the tube, including the transformer, but without a condenser, and did not include Rice's neutralizing condenser.

As to Rice, we said that, as Hartley disclosed broadly an auxiliary neutralizing circuit, but without capacity in that circuit, the Rice invention of the audion system was one whose grid plate capacity was neutralized by means of an auxiliary circuit containing inductance and capacity. Hazeltine's plate circuit neutralization differs from both Hartley's and Rice's. The invention is directed to the elimination of undesirable effects of capacity coupling between the grid and the plate circuits of the audion, and it accomplishes the result by an auxiliary circuit, which is electromagnetically coupled to one of the two original audion circuits, and this first circuit is capacitively coupled to the other or second circuit. If a disturbing voltage exists in the second circuit, it will cause currents to flow both in the first circuit and in the auxiliary circuit, due to capacity couplings. This method was broadly stated by Hazeltine before Rice's patent issued, but, when the latter was cited, the claims of the patent in suit were restricted to the improvements which Rice did not disclose. Rice's arrangement provided that the auxiliary circuit be electromagnetically coupled to one of the audion circuits and capacitively coupled to the other. And Hazeltine's claims, which the appellee relied upon below and here, have to do with plate circuit neutralization.

Examining the diagrams furnished of both Rice and Hazeltine, the difference between the two arrangements for neutralizing the regenerative coupling between the plate and the grid of the audion will be observed. Rice's neutralizing coil or inductance is the lower half of the split grid circuit transformer coil. Hazeltine's neutralizing coil or inductance is the secondary of the plate circuit transformer. Rice's neutralizing coil is associated with the upper half of the coil in the grid circuit, while Hazeltine's is associated with the primary of the plate circuit. Thus the patent in suit has a coupling capacity between the grid and a coil electromagnetically coupled to a coil in the plate circuit, which both parties concede to have substantial advantages. The appellant is using the plate circuit neutralization in preference to grid circuit neutralization. Both Rice and Hazeltine made use of the broad idea in using a neutralizing capacity, yet the special application of that instrumentality is different. Rice's plan of neutralization permits the disturbing current to enter the grid circuit, and flow through the inductance and capacity of that circuit, from the grid to the filament. To neutralize it, Rice feeds an equal and opposite current from the plate circuit through the neutralizing condenser into the grid circuit, and through the inductance and capacity thereof to the filament. This is a grid circuit neutralization. In Hazeltine, the disturbing current developed in the plate circuit by the inductive reaction of the plate circuit

transformer (Fig. 2, coil $L_1$) passes as in the Rice across the plate circuit capacity coupling ($C_1$); but, where Rice impresses that disturbance between the grid and the filament system in the grid circuit of the audion, Hazeltine shunts the disturbing current off through the neutralizing capacity ($C_2$) back into the plate circuit, thus accomplishing plate circuit neutralization. By the plate circuit transformer coil ($L_2$) the disturbing current is prevented from flowing between the grid and the filament system, and neutralization is effected wholly within the plate circuit. This was clearly a display of inventive thought and resulted in an improvement over Rice. It amounted to invention.

Appellant uses plate circuit neutralization. But it adds, for the purpose of stabilization, an energy absorbing arrangement, also referred to as the "losser" method of stabilization. It is a fixed stabilizing resistance connected to the grid. It is used as an addition to the plate circuit neutralization. In appellant's arrangement $L_1$ (Exhibit Y–6) is a primary coil of the transformer in the plate circuit, as in Hazeltine's Figs. II and VIII appellant's $L_2$ is the secondary of the plate circuit transformer, and is here used as a neutralizing coil, as in Hazeltine's (Figs. VIII and II). The grid plate capacity of the audion, which is to be neutralized, is shown in dotted lines in the same position as the like capacity $C_1$ of Hazeltine's Fig. VIII and Fig. II. The neutralizing capacity marked $C_2$ in Hazeltine's (Fig. VIII and Fig. II) is marked "natural capacity" in Exhibit Y–6. Between the point where the neutralizing capacity is connected to the grid circuit and the grid, there is found in Exhibit Y–6 the stabilizing resistance (R) not found in Hazeltine's Fig. VIII or Fig. II. In operation, the disturbing energy developed in the plate circuit by the inductive reaction of the plate circuit transformer with its tuning condenser ($L_2$, $TC_2$) passes, as in Hazeltine, across the plate grid capacity coupling of the audion. Rice impresses that disturbance, between the grid and the filament system, in the grid circuit.

The appellant's receiver, like Hazeltine's shunts the disturbing current off through the neutralizing capacity, marked "natural capacity," back into the plate circuit, and thus accomplishes plate circuit neutralization by the plate circuit transformer coil ($L_2$), just as Hazeltine does. The stabilizing resistance is not a part of the neutralizing balance; it absorbs some part of the energy of the disturbing current. The appellant's neutralization is effected wholly within the plate circuit. Thus structurally and functionally the neutralization is by the same method; that is, plate circuit neutralization. The neutralization is accomplished by leading the disturbing energy off from the grid through the connection back to the plate circuit. Using the Rice patent, under which appellant's manufacturer is licensed, it could connect the central point of the grid circuit transformer (coil 4) to the filament, and connect the lower end of the grid circuit transformer (coil 4) through a neutralizing capacity to the plate; but its receiver effects neutralization by using the neutralizing capacity, between the grid and the secondary coil ($L_2$) of the plate circuit transformer, so that the disturbing current, instead of flowing into the impedance of the grid circuit, flows back into the plate circuit, and thus the neutralization is effected wholly in the plate circuit by the plate circuit transformer coil $L_2$. This was illustrated by removing the neutralizing capacity in the appellant's receiver, after which the receiver oscillated at all frequencies in the broadcast range. It is argued that it did not require inventive thought to combine the plate circuit neutralization with what Rice had accomplished. But Rice had no plate circuit neutralization.

The claims relied upon are in no way limited by close coupling. It is contended that the only distinction between Hazeltine and Rice is the closeness of coupling; that Hazeltine's patent cannot be expanded by ignoring the express limitations of close coupling, which it is said is the essential feature of the Hazeltine method. In narrowing his claims in distinguishing his invention from Rice, who had a grid circuit neutralization, Hazeltine did consent to close coupling in so far as the grid circuit neutralization claims were concerned, but broadly he secured a patent for plate circuit neutralization over and above Rice, who is the nearest in the prior art.

The inventor was a consulting engineer in the service of the Navy Yard, designing radio apparatus in 1918. He sent his first draft of the patent application to that department, showing the broad idea of neutralization of capacity coupling—the application of his grid circuit neutralization scheme to neutralization of the grid plate capacity coupling in an audion circuit. Because the plate circuit application of his neutralization scheme was not specifically claimed in that application, a second application, which finally resulted in the patent in suit, was filed. Pending the preparation of the second application, the disclosure of the grid circuit neutralization stood in the application for the first patent.

But prior to July 14, 1919, Hazeltine's research resulted in his invention of plate circuit neutralization. Both grid circuit neutralization and plate circuits neutralize, but they are different circuits, and each conception came to him at a different time, some months intervening. On July 11, 1919, he sent to the Navy Department a draft of his patent, disclosing and claiming the schemes for neutralizing capacity couplings in audions. This draft disclosed and claimed plate circuit neutralization as well as the grid circuit neutralization. Fig. 2 was then identical with Fig. 2 of the patent in suit, and the description of it was the same.

The claim that the only distinction between Hazeltine and Rice is the closeness of the coupling, and that the patent here in suit was expressly limited to close coupling, and cannot be expanded beyond it, is without force in the light of the history of those applications and the patents resulting therefrom. When Hazeltine's applications were originally filed, he was uninformed about the Rice invention; he had broad claims for the use of neutralization, and to avoid Rice's grid circuit neutralization he consented to the close coupling improvement over Rice. And as a result of Hazeltine's application there is disclosed (1) an unsymmetrical arrangement, associated with unequal coils, having a ratio of turns equal to the inverse ratio of the uneven capacities with which they are respectively associated; * * * (2) close electromagnetic coupling between the neutralizing coil and the coil with which it is associated; and (3) plate circuit neutralization. These were regarded as patentable advances beyond Rice.

The first patent, No. 1,450,080, was for this unsymmetrical arrangement of closely coupled neutralized circuits generally, the maintenance of proper ratio of turns to capacity. The subject-matter of the second patent, No. 1,489,228, is the electric circuit arrangements for neutralizing grid plate capacity coupling of an audion characterized by a degree of close coupling substantially equal to unity. The subject-matter of the claims of the patent in suit is plate circuit neutralization. This is claimed broadly, without limitation to the degree of coupling in the claims herein relied upon. Close coupling is usable with plate circuit neutralization, as well as with grid circuit neutralization, and according to Hazeltine it is the preferred form of neutralization. The plate circuit neutralization, as defined in claims 1, 2, and 5, is not disclosed in the Rice patent,

and therefore belongs broadly to Hazeltine. And the particular preferred embodiment of plate circuit neutralization with close coupling is defined in claim 3. It is not relied on here. Therefore close coupling is not the only difference between Rice and Hazeltine, for, as we have said, Rice did not disclose plate circuit neutralization.

The words "to cause equal capacity currents to flow to and from the grid," used in claims 1, 2, and 5, whereby such current is prevented from flowing between the grid and filament system, does not demand absence of regeneration, as appellant argues. The argument proceeds that Hazeltine's idea was to prevent any regenerative amplification, and consequent distortion. The idea seems to be that, unless regeneration is wholly eliminated by neutralization, there is no infringement. From this it is claimed throughout that close coupling is essential to the inventor's method. In other words, the claim of noninfringement is that neutralizing current is not equal to disturbing current, basing the argument upon the limitation of the patent to perfect neutralization. But it is clear enough that the appellant uses plate circuit neutralization, so as to give to his multistage tuned radio frequency amplifiers the freedom from squeals and whistles which characterized amplifiers until Hazeltine neutrodynes appeared. Perfect neutralization is an ideal, but is apparently not practically attainable.

It is argued that claims 5, 9, 11, 12, 14, and 16 are not infringed, because they include the neutralizing capacity connected between the grid electrode and the neutralizing coil, and that the appellants do not have any such capacity connected between the grid and plate circuit, and that such natural capacity as exists, because the parts are arranged close together, are not described by these claims. But the fact is that the condenser plates are electrically and conductively connected to the transformer coils by a wire indicated in red lines as shown at the right of the diagram Y-6.

The argument that the idea of using and claiming plate circuit neutralization, and applying it to a multistage amplifier as well, obtaining a neutralizing capacity from the inherent capacities, all came to Hazeltine long subsequent to July 14, 1919, from one Wheeler, is incorrect. It was clearly refuted by this record and the history of the patent application. Hazeltine's conception, including utilizing the inherent capacities for neutralization in the audion system, was in the first draft of his patent application, May, 1919.

He referred to the arrangement of the ancillary circuit depending on the form of the original circuits saying: "In some cases it is necessary to add coils or capacities to the original circuits to provide the required couplings, while in other cases the couplings may be obtained from coils present for other purposes or from inherent capacities." And in the patent in suit he expresses the same idea. It therefore appears that the idea of inherent capacity did not come to him as late as 1925, as argued.

Another argument advanced by the appellant is that the appellant's manufacturer merely adopted the development of the wartime multistage regenerative amplifiers. Multistage amplifiers were developed by the French, British, and United States armies and United States Navy. As appellee contends, the record shows the army and navy receivers were of the particular form of the Armstrong regenerative receivers. Armstrong v. De Forest Radio Telephone & Telegraph Co. [C. C. A.] 280 F. 584. The art has advanced much since then. The army and, navy amplifiers were fundamentally the same. They were regenerative amplifiers differing from standard single circuit regenerative amplifiers, in that they had three or four stages of amplification coupled to one another by transformers and without the tuned coupling circuits of the present broadcast receiver. In operation they gave rise to squeals and whistles of the regenerative receivers. The problem in the design of these multistage regenerative amplifiers was to get the amplifier built in such a way that it would not oscillate continuously and uncontrollably.

The record shows that the stages there used were unshielded from one another and there were stray couplings between the different parts. There were magnetic couplings and capacity couplings, not only between the parts of the adjacent stages, but between each stage and every other stage. The effect of the grid plate capacity of the vacuum tube itself was small in comparison with the other couplings, and to eliminate the effect of the grid plate capacity of the audion would have been to eliminate a minor disturbance, leaving present more important disturbances. Batsel testified: "We did not know how to neutralize the coupling between the plate and grid, so we had that difficulty." He knew how to eliminate various other couplings by shielding, but the neutralization of the grid plate capacity coupling of the vacuum tube was still an unsolved problem. It was unknown to the army accomplishments, or, indeed, the art, in 1922.' It was during the fall of that year that Hazeltine, at the request of manufacturers, designed a radio receiver solving the problem, and brought forth in December, 1922, the plate circuit neutralization covered by the patent. After that plate circuit neutralization was used in all neutrodyne sets which were made. It was the first time that squeals and whistles were eliminated.

In its claim that its receiver was not built upon the Hazeltine plate circuit neutralization principle, appellant asserts that the only difference between the army and navy receivers and theirs is the substitution of a fixed stabilizing resistance (R) for the variable potential potentiometer of the army and navy receivers. Much may be said for the argument of the appellee that one Silva, an engineer familiar with the army practice of using a potentiometer, when he entered the service of the Atwater Kent Corporation in May, 1924, added to the information there received what he had learned of the Hazeltine neutrodyne receiver. He designed model 20 receiving set, which was a tuned radio frequency amplifier in which there were no squeals and whistles, after which he took part in designing models 30, 32, and 35. These we think infringe. He said he first took steps to eliminate or reduce to definite order stray couplings which existed in the multistage amplifiers of the controlled regenerative type. The grid plate capacity coupling inside the audion bulb gave rise to objectionable oscillations, with accompanying whistles and squeals. To eliminate the effect of that coupling, Silva left in the receiver a definite amount of particular inherent capacity coupling, which existed between the parts and the apparatus connected to the grids of the adjacent tubes. Since this capacity is directly connected to the grid and to the high potential end of the secondary $L_2$ of the plate circuit transformer, it is in the right position and it is rightly connected to effect plate circuit neutralization. Silva then proceeded to so proportion the remaining inherent capacity coupling that this plate circuit neutralizing arrangement would balance the major part of the grid plate capacity coupling. This was done carefully and deliberately. It became a more compact receiver. Its parts were brought closer together, but in doing so he accomplished plate circuit neutralization.

Model 35 has the same arrangement of the coils and also has the compact arrangement of the condenser. It has the shielding against over-all coupling, because it is completely sur-

rounded by its metal case, diverts a part of the dielectric field that otherwise would tend to go around through space from the first condenser to the last. Model 30 has the same arrangement of coils at right angles. It has a very compact arrangement of the condensers and a metal plate on two sides, bottom and face, and gives considerable shielding against possible over-all capacity coupling. Model 32 differs from the others. The magnetic coupling is here reduced to zero; the transformer secondaries are in two halves, and by connecting them in the reverse way they are astatic; they do not have magnetic coupling with one another. The shielding effect is not so prominent, but this model, too, has plate circuit neutralization. The removal of that portion of the neutralizing capacity which exists between the tuning condensers was sufficient to reduce the plate circuit neutralization to the point where oscillations occur in all except model 32. But model 32 receivers depend, for the prevention of oscillation, upon plate circuit neutralization. The amount of plate circuit neutralization necessary to prevent them from oscillating is rather definitely fixed, and it was shown that model 32 receivers have considerably more than enough to prevent oscillation.

The appellant attempts to escape the charge of infringement, based upon the claim that in its sets the neutralization is quantitative and not perfect. But measurements made show it to be well within the range of ordinary engineering practice. What is neutralized is the grid plate coupling capacity of the audion tube. Standard audions vary in capacity within certain limits, and the set can never be exactly neutralized for all tubes.

If our conclusions are correct that plate circuit neutralization has been accomplished by Hazeltine and involves inventive thought, as well as a definite and tangible method of arrangement of the parts, the fact that the appellant does not practice the plate neutralization perfectly does not avoid infringement.

Nothing in the prior art approached or suggested plate circuit neutralization. The nearest was the Rice patent, which we have considered. The patent is valid, and the claims in suit are infringed.

Decree affirmed.

L. HAND, Circuit Judge (dissenting). On July 14, 1919, Hazeltine prepared a draft specification which contained in Figure 2 a schematic diagram of plate circuit neutralization, described as an "alternative arrangement" to that "preferred," i. e., grid circuit, and claim 4 of which was for plate circuit neutralization per se. This application he never filed, and in his application of August 7th of that year, which became patent 1,450,080, he disclosed only grid circuit neutralization, apparently not then regarding the "alternative" as important. The parent application of the patent in suit was filed on December 28, 1920, and it disclosed the same two figures as had been used in the draft application, one for grid, and the other for plate, circuit neutralization, together with multistage amplifiers which the draft application had not contained. The specifications described means for the complete neutralization of natural grid-plate capacity, so as to eliminate all backfeed whatever, to wit, close coupling between the primary in grid or plate circuit with the secondary in the auxiliary circuit, together with a ratio of turns in the transformer equal to the ratio of the introduced capacity in the auxiliary circuit to the natural grid-plate capacity, by both of which equal and opposing currents would flow through the inherent and the introduced capacities.

Of his original first 11 claims, some, e. g., Nos. 1, 2 and 5, were general; that is to say, the transformer might be in either circuit, though claims 3, 4, and 11 were specific for grid circuit neutralization. All the claims were at once rejected on Rice, who, the Examiner said, "uses the almost identical method as applicant." Thereupon, on September 13, 1922, Hazeltine canceled all 11 claims and substituted 6 others, all for grid neutralization, except the first 2, which were for either grid or plate, and all containing as elements close coupling and the ratio of turns equal to that of capacities. He urged their allowance, because the "scope" of the claims "had been so restricted as to make them allowable over Rice." Before any action had been taken, and on November 8, 1922, he added 9 new claims, of which Nos. 15, 16, 17, and 18 were specifically for plate circuit neutralization, and are the progenitors of claims 1, 3, 4, and 5 in suit. Nos. 16 and 17 contained the elements of close coupling and the same ratio of turns to capacities, but Nos. 15 and 18 prescribed more generally that the apparatus should be made so as to cause equal currents to flow through the natural and the introduced capacities.

On November 12, 1923, the Examiner again rejected all the claims on Rice, and on December 28, 1923, Hazeltine transferred claims 15, 16, 17, and 18 to the division in suit, and submitted further argument, supported by Pupin's affidavit, to show that close

coupling equal to "100 per cent." made a "radical difference" from Rice, since it set up "equal currents" through the capacity in the auxiliary circuit and the inherent grid-plate capacity. While Pupin's affidavit did say in conclusion that Rice did not show plate circuit neutralization, the bulk of it was directed to proving that Hazeltine completely eliminated feed-back by his "close" coupling, while Rice did so only partially at best. Claim 2 in suit was introduced during the progress of the division and adds nothing of substance.

Thus it appears that Hazeltine got Nos. 1, 2, and 5 of the claims in suit upon a limitation introduced to avoid Rice. He now argues that "equal currents" cannot mean the same as close coupling and an equal ratio of turns to capacities, and I agree that it might cover other means of reaching the same result, if they were electrical equivalents. Perhaps there are such, though none are suggested; but, whatever these may be, they must be at least designed to eliminate all feed-back by creating equal and opposed currents through the capacities, for that is certainly what the words were intended to mean. It is no answer to say that this is theoretically impossible. The point is that the patent was obtained only upon a concession that it covered a device which aimed to do so, so far as it was humanly possible. The defendant does not do it, does not try to do it, does not want to do it. In so far as its grid resistance may be said to accomplish the same result, it is a means which Hazeltine did not even intimate. As an excuse for ignoring the language, the plaintiff argues that one does not avoid infringement by practicing the invention imperfectly. I agree, if he practices it at all, but we must first find out what the invention is, and if it appears that it was voluntarily circumscribed in the office, it carries its limitations always.

The remaining claims in suit first appeared in the division on December 28, 1923, or later. They are only for the application of the invention to multistage amplifiers, as the specifications prove (page 2, lines 129–131; page 3, lines 5–11; lines 27–35; lines 56–63; lines 71–86), and the elements necessary to the general claims 1, 2, and 5 are implied in them. Indeed, I do not understand that the plaintiff distinguishes between the two groups in this respect. At any rate, the patent issued on a concession as to the genus, which may not be retracted as to the species. I do not think that the defendant has infringed any of the claims in suit.