## HAZELTINE CORPORATION v. RADIO CORPORATION OF AMERICA.

District Court, S. D. New York.
Sept. 14, 1931.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis and R. Morton Adams, both of New York City, of counsel), for plaintiff.

Stephen H. Philbin, of New York City (Stephen H. Philbin, of New York City, and Abel E. Blackmar, of Brooklyn, N. Y., of counsel), for defendant.

WOOLSEY, District Judge.

I hold that claims Nos. 1, 2, 5, 9, 11, 12, 14, and 16 of United States patent No. 1,-

533,858, the Plate Circuit Neutralization patent, are valid and have been infringed by the defendant.

I hold that claims Nos. 1, 2, 3, 14, 15, 17, 18, and 21 of United States patent No. 1,648,808, the Conductance Ratio patent, are invalid for want of invention.

██ As each party has prevailed on one of the patents in suit, costs will not be granted to either party.

I. This is a suit under the patent law; consequently the jurisdiction of this court is obvious. There are not any questions involved as to venue or as to ownership of the patents by the plaintiff.

The question of the validity of the claims, here involved, of both patents, and of the infringement thereof, if valid, is raised by the defendant, and has been fully dealt with on the trial, on the argument, in the admirable briefs and also in the proposed findings of fact which have been filed herein by counsel.

II. Because of the novelty to me of the subject-matter of the two patents on which this suit is based, the questions involved have seemed to me to be of very considerable difficulty, except in so far as I have been able to turn from an attempt to get some understanding of the laws of electricity, to the decisions of the Circuit Court of Appeals for this circuit in cognate cases covering the same claims of the Plate Circuit Neutralization patent as are here involved. But, with the thoroughness and patience which are proverbial characteristics of the leaders of the Patent Bar, all counsel for both parties have done everything possible to make my task as easy as it might be in this my first trial of a patent suit involving issues of the validity and infringement of claims, and I should be lacking in my manners if I did not, as I hereby do, express to them my appreciation and gratitude.

██ III. United States patent No. 1,533,858, the Plate Circuit Neutralization patent:

A. The validity of the claims, here involved, of the Plate Circuit Neutralization patent, United States patent No. 1,533,858, were sustained by a divided court in the Circuit Court of Appeals for this circuit. Hazeltine Corporation v. Wildermuth, 34 F.(2d) 635, decided July 1, 1929, affirming an unreported decision of Judge Moscowitz.

After that decision, Wildermuth, the unsuccessful defendant-appellant, made application to the Circuit Court of Appeals for leave to reopen the case on the ground that he had discovered an amplifier made by the United States Signal Corps in 1919, known as B C–59–A, which, it was claimed, showed plate circuit neutralization, and was, consequently, an anticipation of Hazeltine's patent.

On November 4, 1929, the Court of Appeals handed down an opinion holding that it would not reopen a patent case on the ground of newly discovered evidence, but would allow to be inserted in its mandate a provision giving permission to the District Court of the Eastern District of New York, whence the appeal had come, to entertain an application for a rehearing of the case on that ground. Hazeltine Corporation v. Wildermuth, 35 F.(2d) 733.

Before this application was decided, the instant suit was tried before me, and the same B C–59–A amplifier, as was referred to in this application for rehearing, was offered in evidence before me as an anticipation of Hazeltine's Plate Circuit Neutralization patent, and marked herein Defendant's Exhibit B.

I made up my mind at the time of the trial that the proof offered about this exhibit was not sufficient satisfactorily to maintain the burden laid on the defendant of showing its identity as a B C–59–A amplifier built in 1919, its history since then, and, if I may so phrase it, the integrity of its condition since it was built, and, indeed, whether, if all those facts were established, it actually had any plate circuit neutralization unless by accident and unknown to its makers.

As this Exhibit B was the only new evidence on which to challenge the validity of the Plate Circuit Neutralization patent already established by the decision of the Circuit Court of Appeals in the Wildermuth Case, I felt, at the end of the trial, that the only question really before me on the first patent was the question of infringement.

Since the decisions of February 2, 1931, of the Circuit Court of Appeals in the case of Hazeltine Corp. v. National Carbon Co., Inc., 47 F.(2d) 573, again affirming Judge Moscowitz in upholding the validity of Hazeltine's Plate Neutralization patent in a case where he had the B C–59–A amplifier before him and repudiated it, and also affirming him, without opinion, in his refusal of a rehearing (also based on the B C–59–A amplifier) in the remanded Wildermuth Case, Hazeltine Corporation v. Wildermuth (C. C. A.) 46 F.(2d) 1015, I feel that the much liti-

gated question of the validity of the Plate Circuit Neutralization patent is settled at least for this circuit, and that the B C–59–A set may properly be banished from consideration here.

I gather, furthermore, from the comments made by counsel for the defendant on the plaintiff's proposed findings of fact in connection with the Plate Circuit Neutralization patent, that defendant's counsel now, in invitum, concedes its validity.

In any event, I hold that B C–59–A amplifier is not established as an anticipation of the claims of plaintiff's Plate Circuit Neutralization patent here in suit, and, with the failure of this only bit of evidence—different from what the Circuit Court of Appeals had before it in the Wildermuth Case —I must necessarily hold that the claims of the Plate Circuit Neutralization patent here asserted are valid, and I do so hold. Cf. Judge Mayer's remarks in General Electric Co. v. P. R. Mallory & Co. (D. C.) 286 F. 175, 178, 180, and Id. (D. C.) 294 F. 562, 563, affirmed (C. C. A. 2) 298 F. 579.

B. When I take up the question of infringement of the plaintiff's Plate Circuit Neutralization patent by the defendant's Radiolas models 16 and 17, I am met at the threshold of my investigation of the facts by the question of the scope of the claims here involved, as defined by the Circuit Court of Appeals in Hazeltine Corporation v. Wildermuth, 34 F.(2d) 635, for in that case the court had the same claims before it as I have here.

In the Wildermuth Case, Judge Manton, writing for the majority of the Court of Appeals, said, 34 F.(2d) at page 638 (italics mine): "The claims relied upon are in no way limited by close coupling. It is contended that the only distinction between Hazeltine and Rice is the closeness of coupling; that Hazeltine's patent cannot be expanded by ignoring the express limitations of close coupling, which it is said is the essential feature of the Hazeltine method. In narrowing his claims in distinguishing his invention from Rice, who had a 'grid circuit neutralization,' *Hazeltine did consent to close coupling in so far as the grid circuit neutralization* claims were concerned, but broadly he secured a patent for plate circuit neutralization over and above Rice, who is the nearest in the prior art."

Then after dealing with the Patent Office history of Hazeltine's application, Judge Manton again emphasized the fact that Ha-

zeltine was entitled to a broad claim of plate circuit neutralization by saying, 34 F.(2d) at page 639 (italics mine): "The subject-matter of the claims of the patent in suit is plate circuit neutralization. *This is claimed broadly, without limitation to the degree of coupling in the claims herein relied upon.*" And later, on the same page, he said: "The words 'to cause equal capacity currents to flow to and from the grid,' used in claims 1, 2, and 5, whereby such current is prevented from flowing between the grid and filament system, does not demand absence of regeneration, as appellant argues. * * * In other words, the claim of noninfringement is that neutralizing current is not equal to disturbing current, basing the argument upon the limitation of the patent to perfect neutralization. But it is clear enough that the appellant uses plate circuit neutralization, so as to give to his multistage tuned radio frequency amplifiers the freedom from squeals and whistles which characterized amplifiers until Hazeltine's neutrodynes appeared. Perfect neutralization is an ideal, but is apparently not practically attainable."

The question of infringement by the defendant's Radiolas Nos. 16 and 17 of the claims on which the plaintiff founds this suit does not, therefore, depend on the method by which, or the extent to which, the defendant uses plate circuit neutralization, but depends on whether it is actually shown that the defendant uses plate circuit neutralization to any extent.

It is clearly proved, I find, that the defendant does practice plate circuit neutralization, and, hence, infringes the claims of the plaintiff's patent here in suit.

I think it is common ground, because it is admitted by the defendant's expert, Professor Chaffee, that in assembling its Radiola models Nos. 16 and 17, the interstage transformers have been so arranged by the defendant as to minimize any magnetic coupling between the stages, which might cause oscillation, and that the two sets are so shielded by grounded metal shields as practically to eliminate all capacities except certain inherent capacities existing between various portions of the apparatus.

The principal capacities so left are in proper direction and connection to effect the plate circuit neutralization of the claims of Hazeltine's patent.

These capacities—when the evidence of MacDonald and Hazeltine is read on Plaintiff's Exhibit 5—are shown to be the inherent

capacities marked C 2 and C'2, on the rear view of drawing of the Radiola 16, and extend between the stators of the turning condensers, between leads and between secondary transformer coils. The other inherent capacities are reduced to unimportance by shielding, or are practically negligible.

The tests, made and described by MacDonald, of the Radiolas Nos. 16 and 17, were tests of the kind mentioned with approval by the Circuit Court of Appeals in Hazeltine Corporation v. Wildermuth, 34 F.(2d) 635, at page 638.

These tests showed that the capacities above mentioned were substantial, and that they were effective, for, if they were shielded out, the sets would oscillate over substantially the whole spectrum of broadcast frequencies.

The use of the plate circuit neutralization, although perhaps not in accordance with the plaintiff's preferred method, is, therefore, as I find, intentional and substantial and constitutes an infringement of the claims of patent No. 1,533,858, on which the plaintiff founds its cause of action here.

The defendant endeavors to meet this evidence of infringement by invoking a far narrower scope for Hazeltine's Plate Neutralization patent than the scope fixed therefor by the Circuit Court of Appeals. This is, of course, a defense to which, for the reasons above given, I am precluded from listening.

That the defendant, with control of the Rice patent, does not use grid circuit neutralization instead of trespassing on the plaintiff's monopoly, may seem astonishing, but the explanation, apparently, is that the Hazeltine method of neutralization is more effective. Indeed, the use by the defendant of plate circuit neutralization in its Radiola models, here involved, is most eloquent confirmation of the value of Hazeltine's patent and of its advance over Rice as a better practical method of controlling instability, or the tendency to produce regeneration and oscillation in such receiving sets.

IV. United States patent No. 1,648,808, the Conductance Ratio patent:

A. The Conductance Ratio patent, United States patent No. 1,648,808, has not been adjudicated, and, consequently, on turning to a consideration of it, I find myself at large.

This branch of the plaintiff's suit is based on claims Nos. 1, 2, 3, 14, 15, 17, 18, and 21, of this second patent.

As I understand the plaintiff's contention under this head, it is that, having by his invention of plate circuit neutralization in 1922 achieved the nearest approach to which the radio art had then come to complete neutralization of the inherent and otherwise inescapable grid plate capacity of the vacuum tube in tuned radio frequency amplifiers, he conceived the idea that by an appropriate ratio of turns between the primary and secondary coils of the output transformer of a tube, he could secure, without too great a sacrifice of amplification, a broader hospitality to any given frequency of the broadcast band, and hence a higher and more effective selectivity, so that, when the set was tuned to a signal of a certain frequency, signals of frequencies near enough to threaten interference would be more effectually excluded, or, as perhaps it might be better expressed, there would be a wider and firmer meshing between the incoming signal and the radio frequency amplifiers of a receiving set like the neutrodyne, and thus the energy of the incoming radio waves to be dealt with by such a set, could be more effectively and smoothly amplified and controlled in the presence of imperfection of material in the receiving set, errors in its assembly, or changes of electrical values during its use.

B. In a rapidly growing art, such as radio broadcasting and receiving, the frontiers of desiderata change rapidly in direction and in form.

Prior to 1922 the fact that the broadcast stations were few put the main emphasis of advantage on a radio receiving set with great amplification and rendered selectivity comparatively unimportant. But when the broadcasting stations increased in number, and the wave lengths employed by them came to be, often, of neighboring frequencies, selectivity increased in importance.

The stories of the invention of plate circuit neutralization and of the alleged invention of the conductance ratio are somewhat intertwined, and may be thus summarized:

In 1922, at the request of certain independent radio manufacturers who desired him to endeavor to make an improvement on the regenerative broadcast receivers then existing which had a tendency to oscillate and emit squeals and whistles, Hazeltine designed a receiver employing plate circuit neutralization, the subject-matter of the first patent in suit. In this set, a tube, manufactured by the defendant and known as U V–201, was used, and the conductance ratio was designed

in accordance with the teaching of Latour, which was that the transformer input conductance should be nearly equal to the conductance of the vacuum tube which preceded it.

This was in the autumn of 1922, and plate circuit neutralization seemed to have solved the problem then presented.

In February, 1923, the type of tube put on the market by the defendant changed, and a new tube known as U V–201–A was brought out. This tube had considerably higher amplification than the tube U V–201.

When the tube U V–201–A, with its much higher amplification, was put into a neutrodyne set, it was found that it disturbed the comparatively satisfactory electric equilibrium which had been achieved by Hazeltine's plate circuit neutralization with a U V–201 tube, and thus a new problem was opened up, namely, how to avoid the magnification, due to the increased amplification of the new tube, U V–201–A, of such residual couplings, magnetic or capacitative, as were left in the neutrodyne at its then stage of development.

Shortly thereafter, in order to meet this new problem, Hazeltine worked out on March 11, 1923, the conductance ratio theory, on which he bases the second patent here in suit.

He found that by the application of the proper conductance ratio,—which he specifies as 4:1,—he could achieve the happy result of reducing the amplification of the tube U V–201–A, which had become practically the only available tube on the market, and thus tend to restore the equilibrium of his sets, and, at the same time, that he could get greater selectivity, a characteristic then increasingly in demand marketwise.

It is to be noted, however, that it was not until February 27, 1925, almost two years later, that Hazeltine filed his application for the Conductance Ratio patent, which was allowed as United States patent No. 1,648,808 on November 8, 1927, as a patent for a wave signaling system. Hazeltine, I am advised, is now involved in interference proceedings in respect thereof, in the Patent Office, involving, of course, the question of priority only and not the question of invention. Cf. Lowry v. Allen, 203 U. S. 476, 482, 27 S. Ct. 141, 51 L. Ed. 281; Fekete v. Robertson, 57 App. D. C. 73, 17 F.(2d) 335, 336; Hillard v. Remington Typewriter Co. (C. C. A. 2) 186 F. 334, 336.

C. The Conductance Ratio Patent states clearly enough the effect of a change of conductance ratio on amplification and selectivity, respectively, but on the question of sta-

bility so much stressed on the argument by counsel for the plaintiff, it becomes—to put it in the least critical terms—somewhat oracular.

The patent states, inter alia, in its specifications (italics mine):

"This invention relates to wave signalling systems, particularly radio receiving systems, and has for its object the provision of a radio receiver which is highly sensitive, and highly selective, and at the same time is simple to control. This result is accomplished primarily by employing tuned radio-frequency amplification, preferably in more than one stage, with the complete elimination of coupling between plate circuits and the grid circuits except through the mutual conductance of the amplifying vacuum tubes, and *with an arrangement of the amplifier transformers so that their input conductances are related in a certain way to the conductances of the vacuum tubes.* * * *

"The proper input conductance of the amplifier transformers is obtained by employing a primary winding of fewer turns than has previously been the practice. The results are: (1) high selectivity; (2) substantially complete neutralization of capacity coupling over a wide range of frequency with fixed neutralizing adjustments, even though there be slight unavoidable deviation from the ideal conditions for neutralization; and (3) higher amplification than is obtained with the large number of primary turns previously customary."

Later, after some calculations which need not be reproduced here, the gist of the alleged patent is thus summarized in the specifications:

"that the amplification at resonance is a maximum when the ratio of turns of the transformer is so chosen that the input conductance of the transformer is equal to the plate conductance of the vacuum tube If the number of primary turns is reduced below this value, the amplification falls off, but less rapidly at resonance than at other frequencies. For example, if the number of primary turns is halved relative to its value for maximum resonant amplification, the amplification at frequencies far from resonance is also halved, but the amplification at resonance is reduced only twenty per cent. The result is a decided gain in selectivity, since interfering signals are weakened proportionately more than the signal tuned in."

In the course of his specifications Hazeltine also mentioned plate circuit neutra-

lization—now established as his by the patent first discussed—but in all the claims on which he founds this suit, at least until we come to claim 21, there is not even a hint that added stability was a part of his invention as claimed.

Claims Nos. 1, 2, and 3 will suffice for quotation. They read:

"1. The method of operating a tuned radio frequency amplifier, including a vacuum tube and an output transformer associated therewith, which consists in arranging the input conductance of said output transformer at resonance, so that it is substantially higher in value than the plate conductance of said vacuum tube.

"2. In a tuned radio frequency amplifier a vacuum tube and an output transformer pertaining thereto whose input conductance at resonance is substantially higher than the plate conductance of said vacuum tube.

"3. In a tuned radio frequency amplifier including a plurality of amplifying stages, a vacuum tube in each stage and a step-up transformer in the plate circuit of said vacuum tube, the input conductance at resonance of said transformer being substantially higher than the plate conductance of said vacuum tube."

Claims Nos. 14, 15, 17, and 18, though adding additional elements, must, I think, stand or fall by claims Nos. 1, 2, and 3.

Claim No. 21 will be dealt with separately hereinafter.

D. The question of invention, rather than of anticipation, is, I think, the first question to be considered on the question of the validity of a patent; for it is a sine qua non of any patent, whilst anticipation may be a defense to a patent otherwise good. This order of consideration of these defenses seems to be implicit in the manner in which the Supreme Court dealt with two patents which were recently before it. Cf. Carbice Corporation of America v. American Patents Development Corporation, 283 U. S. 420, 421, 422, 51 S. Ct. 496, 75 L. Ed. 1153, and DeForest Radio Co. v. General Electric Co., 283 U. S. 664, 685, 686, 51 S. Ct. 563, 75 L. Ed. 1339.

▮ Whether there has been invention or not is a question of fact which must be determined by examining the method or device for which a patent is claimed, in the light thrown on the problem presented to the patentee by the prior art, in order to see whether that light is so suddenly refracted by the teachings of the patent as to be deflected in a new

and different direction and to result in something novel in itself or in its application to the situation involved.

The ingredients of the proof necessary to establish this phenomenon are several, and have been so often referred to, with varying emphasis put on each, as to render it unnecessary to recapitulate them here.

▮ One factor, however, is always required. What is claimed as invention must not emerge too easily from the prior art at the evocation of the hypothetical man skilled therein, who is the analogue, in patents, of the reasonable man, so often called on to help to solve problems in other branches of law, and whose proper response to the situation confronting him is equally subject, it seems to me, to idiosyncratic determination by the trier of the facts.

The instant patent does not, however, present a nice question of invention which might involve me in a test of my predilections. For here I find it clear that the teaching of the plaintiff's conductance ratio, which after all is, in its essence, a method by which a desired result is reached with familiar devices, was known to the prior art.

The use of a smaller number of turns in the primary coil of a transformer, to secure what is the object of Hazeltine's alleged conductance ratio invention, as stated in his claims—that is, its effect on selectivity and amplification—was well established in the prior art, as is shown, I find, by the German patent of Georg Seibt, No. 300,791, described in its heading as patented March 29, 1917, and published April 20, 1920; in the application of Bruno Gerhard Pohlmann for a United States patent, first filed December 22, 1921, and eventuating after a renewed filing on March 5, 1927, in United States patent No. 1,645,733, granted on October 18, 1927[1]; in an article by Scott-Taggart in the May, 1920, issue of the Wireless World; in August, 1920, by Barkhausen in an article in the Jahrbuch der Drahtlose Telegraphie und Telephonice, where, in the relationships of conductance ratio, selectivity and amplification are fully explained; in the experiments in 1922, at Cliffwood, N. J., testified to by Harold Friis and evidenced by the notebook of

---

[1] This application may on the issue of invention properly be considered in the prior art. Milburn Co. v. Davis-Bournonville Co., 270 U. S. 390, 401, 402, 46 S. Ct. 324, 70 L. Ed. 651; Naceskid Service Chain Co. v. Perdue (C. C. A. 6) 1 F.(2d) 924, 925; Lemley v. Dobson-Evans Co. (C. C. A. 6) 243 F. 391, 395, 397; Yale Hook & Eye Co. v. Interwoven Hook & Eye Co. (D. C.) 33 F.(2d) 295, 297, 298.

A. G. Jensen, admitted during the examination of Friis, employees of the Bell Telephone Laboratories, and subsequently published by them April, 1924, in the Bell System Technical Journal in an article entitled "High Frequency Amplifiers—H. T. Friis and A. G. Jensen"[2]; in the experiments in 1915 in long-distance radio-telephony testified to by Englund and Espenscheid, radio engineers of the American Telephone & Telegraph Company; and also in the construction in 1921 for the United States Army Signal Corps of a superheterodyne amplifier known as B C–116, under the designs of Blatterman and Harris, who testified at the trial, and by Blatterman's 1921 notebook. Defendant's Exhibit Y, which I hold was admissible as corroborative of his evidence. Cf. Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U. S. 358, 376–378, 48 S. Ct. 380, 72 L. Ed. 610; Westinghouse El. & Mfg. Co. v. De Forest Radio T. & T. Co. (C. C. A. 3) 21 F.(2d) 918, 924; Twentieth Century Machine Co. v. Loew Mfg. Co. (C. C. A. 6) 243 F. 373, 379.

Furthermore, the fact that Hazeltine, in spite of his experience with patents, waited almost two years after his alleged invention on March 13, 1923, before he filed any application for his conductance ratio patent, and the fact that, for several years after he used his conductance ratio in his neutrodyne, he did not make any measurement of the conductance values achieved, make it appear probable that, contemporaneously at least, he must have rated what he had done as in the zone of the mere application of engineering skill to the radio art.

E. The attitude of the parties here is in accordance with the essence of forensic philosophy, which was quaintly and aptly summarized by a sea captain whom I was once examining. When faced with an apparent discrepancy between letters which he had written and the evidence which he was then giving, he said to his cross-examiner, in explanation: "In this world, a man always has to exaggerate and unexaggerate according to circumstances." So, here, the defendant sought to narrow the scope of the patent first discussed, and the plaintiff, in respect of the second patent, tried to narrow the scope of the prior art.

With this purpose the plaintiff has endeavored so to divide the radio art, which is,

of course, part of the generic art of electricity, as, in effect, to put his tuned radio frequency amplifier in a separate art, to be dealt with by itself, as a subspecies, so to speak, of the radio art.

The plaintiff's answer to the defendant's citations of prior art consist, therefore, it seems to me, in the main, of a confession followed by an attempted avoidance, which it bases on the ground that the instances covered by the defendant's citations, although they involved the use of the conductance ratio in various connections, including audio-frequency amplifiers to secure the result which the plaintiff claims, did not involve its use in tuned radio-frequency amplifiers, of the kind to which the plaintiff refers in his specifications.

The defendant answers this argument adequately, I think, by saying:

"A radio broadcast receiver includes radio frequency amplifiers, detector and audio frequency amplifiers. The problems are those relating to alternating currents of high or radio frequency about 20,000 cycles upward and low or audio frequency below 20,000. The design of the radio frequency portion is part of the general electrical art and is in the same field as the design of the audio frequency portion."

F. Claim 21 of the Conductance Ratio patent, however, requires separate attention.

It reads as follows (italics mine): "21. A tuned radio-frequency amplifier having an input circuit and including a vacuum tube having grid and plate electrodes, means for tuning said input circuit, a radio-frequency transformer having a primary winding with a low number of turns connected in the plate circuit of said vacuum tube, having a secondary winding with a number of turns great with respect to the number of primary turns connected in the input circuit of a second vacuum tube and having means for tuning said second input circuit, whereby the input conductance of said transformer at resonance is substantially greater than the plate conductance of said first mentioned vacuum tube, the *high potential terminal of said secondary winding being of opposite polarity to the high potential terminal of said primary winding, the means for tuning said last mentioned input circuit being operable over a frequency range for which said amplifier is unstable when said input circuits are tuned thereto, and means for maintaining the amplifier stable, notwithstanding said input*

[2] It was stipulated at the end of the trial that if Jensen, who was then in Europe, could have been called as a witness, he would have corroborated Friis.

*circuits are tuned throughout said frequency range.*"

The phrase "means for maintaining the amplifier stable," etc., is a somewhat equivocal phrase. For if it were contended that it is foreshadowed in the specifications on page 1 of the patent at lines 53–59, as one of the purposes of the patent, it may be answered that it might quite as well be read as referring to plate circuit neutralization mentioned on page 2 of the patent at lines 95–115.

The doubt as to its reference, which led me at one time to think that there might be something in this claim additional to the effect of the conductance ratio on selectivity and amplification respectively, is resolved, however, by the statement of plaintiff's counsel at page 94 of their main brief that the words italicized in the quotation above refer to plate circuit neutralization.

■ Plate neutralization is as much in the prior art by reason of Hazeltine's own earlier patent therefor as if it were the creation of some one else. Underwood v. Gerber, 149 U. S. 224, 227, 231, 13 S. Ct. 854, 37 L. Ed. 710; Kirsch Mfg. Co. v. Gould Mersereau Co. (C. C. A. 2) 6 F.(2d) 793, 794; Cutler Hammer Mfg. Co. v. Beaver Machine & Tool Co., Inc. (C. C. A. 2) 5 F.(2d) 457, 460; Harvey Hubbell, Inc., v. General Electric Co. (C. C. A. 2) 267 F. 564, 568; Doig v. Morgan Machine Co. (C. C. A. 2) 122 F. 460, 462. And cf. National Electric Ticket Register Co. v. Automatic Ticket Register Corporation (C. C. A. 2) 15 F.(2d) 257, 258.

■ Moreover, the claims of a patent must not, of course, be so construed as to make them cover the prior art. Hubbell v. United States, 179 U. S. 77, 80, 21 S. Ct. 24, 45 L. Ed. 95, and cases there cited.

Consequently, in spite of the emphasis put by the plaintiff's counsel throughout their briefs on the increased stability due to the proper use of the conductance ratio, there is not disclosed in the claims of the patent—even when read in the light of the specifications—anything other or further than the effect of the conductance ratio on amplification and selectivity.

I think, however, that I should not close my discussion of the conductance ratio patent without stating what I understand was referred to by plaintiff's counsel as the stability or toleration thereby achieved.

It is quite clear, I think, from the evidence and from the argument of plaintiff's counsel, unchallenged in this regard, that by increasing the conductance of the primary or input coil of a transformer to a point at which it is considerably higher than the conductance of the plate circuit of the preceding tube, there would be caused—what we agreed on the argument to call—an increase of its hospitality to electric energy, and that this would encourage the flow of such energy away from the plate electrode and thus tend to prevent the storage of electrical energy at the plate end of the grid plate capacity with its resultant unfortunate tendencies to regeneration.

Hazeltine, in his Conductance Ratio patent, mentions, as above noted, the use of his plate circuit neutralization which would largely control any existing tendency to regeneration, irrespective of the use of the conductance ratio which he advocates.

When he adds the conductance ratio to the plate circuit neutralization, the effect is, to speak in metaphor, as if he had tilted the plate still further away from any tendency to regeneration, because electrical energy in the plate circuit, through the proper use of conductance ratio, would find an easier path into the transformer coil than it would find in the direction of the plate electrode, and thus a greater degree of neutralization would be achieved. This is what I understand the plaintiff calls the stability or toleration achieved by the teaching of the Conductance Ratio patent.

Accordingly, a set equipped not only with plate circuit neutralization but also with the conductance ratio advocated in the patent under consideration would have for the control of regeneration the plate circuit neutralization *plus* what I shall again call for convenience the hospitality of the input coil of the transformer.

Whether a method of securing this second effect would be patentable or not I do not attempt here to say. But I do say that if this was what Hazeltine meant to describe as his invention, or part of it, I think that he did not describe it clearly in his specifications and he certainly did not claim it in any of the claims of his patent on which this suit is based.

■ The description of a patent in the claims should be such as would enable a man skilled in the art of the patent to know the exact limits and scope of the invention. Cf. Grant v. Walter, 148 U. S. 547, 554, 13 S. Ct. 699, 37 L. Ed. 552; Haines v. McLaughlin, 135 U. S. 584, 596, 10 S. Ct. 876, 34 L. Ed. 290; Western Electric Mfg. Co. v. Ansonia Brass

& Copper Co., 114 U. S. 447, 5 S. Ct. 941, 29 L. Ed. 210; James v. Campbell, 104 U. S. 356, 26 L. Ed. 786; Burns v. Meyer, 100 U. S. 671, 672, 25 L. Ed. 738; Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235.

Here certainly such a phrase in claim 21, as "means for maintaining the amplifier stable"—quite irrespective of the admission of plaintiff's counsel, above noted, that it referred to plate circuit neutralization—is far too broad and vague a phrase to constitute conceivably any claim for the stability or tolerance, as I understand it, which the plaintiff's counsel has pressed so much in his argument. For even when read in connection with the specifications, as it has to be to give to it any meaning, it is seen to be an illustration of the oracular quality, mentioned above, which seems often to characterize the language of patents.

G. For the reasons given, I am convinced, and I find, that all the claims of the plaintiff's Conductance Ratio patent here in suit are invalid for want of invention.

The teachings of the patent emerge too naturally out of the prior art properly to be considered inventive. For the conductance ratio, which is its essence, was merely an application to tuned multi-stage radio frequency amplifiers by a man skilled in the art of certain well-known principles of radio and cognate electrical arts used to accomplish, with familiar devices, the very purpose for which they had been applied in other cognate situations.

Hazeltine's use of the conductance ratio, therefore, instead of being an instance of invention, was I think, merely an incident of competition—the prompt and able response of a skillful radio engineer to the challenge of the market.

This use of old knowledge to meet a situation similar to those in which it has previously proved its value does not, of course, involve the sine qua non of invention, which is, I think, that it must contain a clearly perceptible element of selective attention infused by an exercise of imagination which sees and then achieves a new use for old knowledge, or a new method whereby an old result is secured. Cf. Thomson Spot Welder Co. v. Ford Motor Co., 265 U. S. 445, 451, 44 S. Ct. 533, 68 L. Ed. 1098; Berlin Mills Co. v. Proctor & Gamble Co., 254 U. S. 156, 165, 166, 41 S. Ct. 75, 65 L. Ed. 196; Atlantic Works v. Brady, 107 U. S. 192, 199, 200, 2 S. Ct. 225, 27 L. Ed. 438; Hansen v. Slick (C. C. A. 3) 230 F. 627, 632, 633; and, especially, Salem Electric Co. v. Thomson-Houston Electric Co. (C. C. A. 3) 144 F. 974, 977, which was an electric patent and is especially apt in connection with the contentions in the present case.

To give an obvious but illustrative example:

If a man had devised and used, without patenting it, a new type of nonconducting top to a thermos bottle, another man could not get a patent for the use of the same type of top on an insulated heat excluding box, for the old device would be used for the same purpose on another article of manufacture. Cf. Aeolian Co. v. Wanamaker (C. C. A. 2) 234 F. 90.

The plaintiff's position, it seems to me, on the Conductance Ratio patent—although the questions of fact involved are far more subtle —is, on reflection, seen to have the same common denominator as the obvious example of nonpatentability just given, for here, as there, the method and the result are both old.

V. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, title 28, USCA, § 723, and I will sign an order so providing. Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Briggs v. United States (C. C. A. 6) 45 F. (2d) 479, 480; cf. El Sol (D. C.) 45 F. (2d) 852, 856, 857.

Such an order and a decree giving to the plaintiff, without costs, the relief asked in the complaint in respect of the Plate Circuit Neutralization Patent, No. 1,533,858, and for dismissal, without costs, of the complaint in respect of the Conductance Ratio patent, No. 1,648,808, may be presented on three days' notice to the opposing party.