## YALE HOOK & EYE CO. v. INTERWOVEN HOOK & EYE CO. et al.

District Court, E. D. New York. June 22, 1929.

### No. 3806.

296

George D. Richards, of New York City, for plaintiff.

Robert B. Killgore, of New York City (Hans v. Briesen, of New York City, of counsel), for defendants.

CAMPBELL, District Judge. This is a suit in equity in which the relief prayed for is an injunction and damages for the alleged infringement by the defendants of patent No. 1,605,902, issued by the United States Patent Office to Leo Rosanman, for sewing machine, dated November 2, 1926.

The patentee has since changed his name to Roseman, and the patent has been assigned to the plaintiff, whose title is not questioned.

The defendant David Silberman is the president of the defendant Interwoven Hook & Eye Company.

The defense is noninfringement.

The suit is based on claims 1, 6, and 29 of the patent in issue.

Tapes having hooks or eyes secured to them are used in large quantities in the garment trade, and the manufacturers of garments do not make the hook and eye tapes which they use, but purchase them from those who specialize in the manufacture of such tapes.

In order to sew the tapes containing the hooks and eyes to the garments without the great loss of time formerly suffered by reason of the necessity for the operator to stop the machine and manually feed the eye loops relative to the needle to produce the traversing stitches, to prevent the breaking of needles by striking the metal eye, the danger to the operator, and the loss of time in replacing the needle, machines and attachments have been supplied to the manufacturers using hook and eye tapes to enable them to attach such tapes containing the hooks and eyes to the garments.

The subject-matter of the patent in suit involves such a sewing machine.

The principal object of the invention is described by the patentee in the patent in suit as follows: "It is the principal object of this invention, therefore, to provide a novel means for controlling the movements of the eye tape to the sewing mechanism of the machine, so that accurate placing of the attaching stitches relative to the loop of the eye is assured, whereby the machine needle will skip the sides of the latter, and whereby any slight variation in the spacing of the eyes on the tape will be automatically compensated for, to always bring the loop of the eye in proper position relative to the machine needle; all to the end that the sewing operations may be carried on at relatively high speed, and without necessity for employing an especially trained or highly skilled operator."

The patent in suit is for a complete sewing machine not an attachment.

The patentee of the patent in suit was not the first to discover, but it was realized by the prior art that in securing by a machine the eye tape to the garment, so that the hooks or eyes should be affixed at definite distances apart, the stretch or inequalities existing in or developed in the tape during the operation would have a tendency to develop inaccuracies in the actual spacing, and have the effect of bringing an eye of the eye tape directly under the needle of the sewing machine when the needle would usually be broken.

The patentee of the patent in suit, in an effort to prevent the likelihood of the needle striking an eye, provided for a positive stop which he generally described in the specification of the patent in suit as follows: "One of the most important features of my present invention, comprises a means for positively controlling the movement of the eye-tape, so that the loops of the eyes of the same will always be brought into proper relation to the sewing needle $12'$ preparatory to traversing said loops with the stitching, and so that slight variations in the feeding movement of the tape, or in the spacing of the eyes on the tape will be compensated for. This means consists of an automatically controlled positive stop device which coacts with the eye-tape so as to positively arrest the latter, to prevent over-running of the eye-tape under the impulsion of the feeding means and consequent displacement of the eyes from properly timed and spaced presentation to the sewing mechanism of the machine."

The stop provided in the patent in suit was so arranged as to cause positively an entire cessation of movement of the tape toward the sewing point at the moment when an advancing eye reached the position of exactly one inch ahead of the sewing point of the machine, which was adapted to make

stitches one-eleventh of an inch each. This positive stop, which operates precisely one inch in advance of the sewing point, gave the eye an absolutely fixed position with relation to the sewing point, and since the engagement of the eye by the positive stop was simultaneous with an operation whereby the tape feeding mechanism was wholly thrown out of operation, a moment was provided therefor, so that whenever an eye contacted with the positive stop, the tape feeding device was momentarily out of operation, the tape lying in a stationary position with the eye held at a dead stop, one inch in advance of the sewing point. Then when the stop was moved out of the way, the feed device again engaged the tape and fed it in the usual way to the sewing point, the sewing machine being modified to cause it to make the first seven stitches of one-eleventh of an inch each, and then two stitches of two-elevenths of an inch each, to bridge the two wires constituting the eye, and when the time had arrived when the positive stop again engaged the next advancing eye, it stopped at one inch from the sewing point, threw the tape feeding mechanism out of operation, and then proceeded from this position of absolute rest through the ensuing sewing period.

The requirement that the tape should be brought to a position of a complete dead stop, at a predetermined distance ahead of the sewing point, was essential to the principle of the patent in suit because continuous feeding of the tape might allow the development of a stretch in the tape, and if a stretch were allowed to remain in the fabric, the eye might be brought directly under the needle.

The importance of the positive stop is fully recognized by the patentee, who says in the specification of the patent in suit: "It must be noted here that the above-described automatic positive stop control device is a basic feature of this invention, and is an essential feature in combination with an eye-tape advancing or feeding means, regardless of the detail structure or specific character of the latter means."

The fundamental principle of the machine of the patent in suit is the principle of employing a positive stop in co-operation with the fasteners on the tape for governing the movement of the tape to the sewing mechanism in such a way that the stop mechanism will actually and positively bring the tape to a clear-cut stop at the moment when each eye reaches a definitely fixed position ahead of the sewing point.

Claim 1 of the patent in suit reads as follows: "In combination with a sewing ma-chine, means for guiding fastener tape to the sewing mechanism of the machine, means for advancing the tape relatively to said sewing mechanism, and an automatic positive stop cooperative with the fasteners on the tape for governing the movement of the tape to said sewing mechanism."

Claim 6 is the same as claim 1, with an additional element, "means for actuating said stop in synchronized relation to said tape advancing means."

Claim 29 is the same as claim 1, with the additional element, "means for intermittently releasing said tape advancing means from engagement with the tape."

■ The filing date of the application for the patent in suit was January 8, 1925, and on the trial the date of invention was carried back to October, 1924.

Plaintiff stipulated on the trial: "That prior to the date of invention of the structure described and claimed in the patent in suit, No. 1,605,902, it was common practice in the garment trade to sew eye tape to garments by means of sewing machines."

And the uncontradicted testimony of Silberman shows that it has been common to his knowledge since 1919 for the different factories to use different machines and attachments for sewing eye tape to garments.

Defendants offered in evidence the following patents issued by the United States Patent Office, which disclose different ways of attaching eye tape or hooks to garments by machines:

Patent No. 1,101,134, to Lyons, June 23, 1924, discloses a sewing machine attachment which grips individual hooks, not eye tape, and moves them from side to side under the needle so that the needle will sew over the wire forming the base loops without striking it.

■ Patent No. 1,579,533, to Hess, April 6, 1926, although later in date than the patent in suit, was granted on an application filed April 28, 1924, which was prior to the date of the invention of the patent in suit, and is prior art.

This patent discloses a machine in which the needle strikes a tripper and causes the needle to move sideways and sew around and not across the base loops of the hooks and eyes.

Patent No. 1,574,184, to Brigham et al., February 23, 1926, also later in date than the patent in suit, was granted on an application filed February 6, 1923, which was prior to the date of invention of the patent in suit, and is prior art.

This patent discloses a sewing machine

for securing eye tape, in which the eye of the tape hits a tripper and arrests the reciprocation of the needle, while the eye is passing under the needle and makes a stitch over the wire as described in the specification of said patent: "One object of our invention is to provide a machine for producing such a line of stitching e (see Fig. 11) without danger of breaking the needle or the thread by contact of the needle with the eyelets, and at the same time forming one or more stitches between the arms of the eyelets whereby the connection of the eyelets to the garment is materially strengthened."

Patent No. 1,272,067, to Lyons, July 9, 1918, discloses a machine for sewing fasteners having perforated bases to a garment by which the fasteners are automatically moved to cause the needle to pass through the perforations to sew them to a garment without permitting the needle to strike the base and break.

A consideration of the prior art, especially the Brigham et al. patent, No. 1,574,184, convinces me that the patent in suit is not a pioneer patent.

The patent in suit is entitled to a range of equivalents sufficiently wide to protect the invention of the patent in suit, and in so far as the instant suit is concerned, that is confined to but one of the patent's many groups, to wit, the so-called positive stop device of claims 1, 6, and 29, infringement of which alone is charged.

The patented machine, so far as is material to the instant suit, comprises the elements of a reciprocating needle, feeding mechanism consisting of a pair of rollers, 24 and 27, which are intermittently rotated to give a step by step feed, the needle entering and leaving the goods to make a stitch while the goods are stationary, all of which are common to all sewing machines and not claimed to have been invented by the patentee; and the further elements of the stop mechanism comprising a main shaft 14, which drives a cam shaft 23, on which one of the feed rolls 24 is mounted; a cam 55 on the shaft 23 actuates a lever 58, crank 57, connecting bar 62, which in turn is connected to the rocker shaft 52, which causes the stop arm 53, on which the stop 54 is mounted, to rise and fall at predetermined intervals in synchronism with the movement of the feed rolls.

No machine built as described in the patent was offered in evidence, and the patentee testified that but two of them were ever built, and both of these were used in plaintiff's factory.

The machine, Exhibit 7, is not the machine of the patent in suit, and comparison can only be made with the patent.

The machine of the patent is designed to operate on tape on which the eyes are one inch apart, and the sewing is done eleven stitches to the inch.

The tape and garment are fed intermittently under the needle by the feed rolls. At the proper instant the stop is lowered into the path of the eyes on the tape and the eye engages the stop, so that the eye can advance no further but is positively stopped.

At the same time the feed rolls are caused to cease feeding or to become temporarily "dormant," simultaneously they release their grip on the tape and allow the stretch to get out of the tape and garment, and then the stop rises and the feeding action of the rolls begins.

Seven stitches, each one-eleventh of an inch long, are now sewed, and after said seven stitches are made, the eye has reached the needle. The speed of the feed rollers is then doubled so that the next two stitches will be two-elevenths of an inch long, and pass over the base wires of the eye. A repetition of this cycle of operations takes place with respect to each eye. The stop 54 is the fixed point from which it is designed always to start the eye.

To change the spacing of eyes or stitches, the feed rolls have to be changed and the stop repositioned.

I agree with the patentee when he said that, unless the "stop" of his patent is used, there is no infringement.

Defendants' machine, Exhibit 2, was one of two or possibly three experimental machines that were never used commercially. It has a serrated plate alongside the needle, which is given a peculiar rising and falling movement by a cam on the main shaft of the sewing machine, which plate engages the eyes of the tape and gives them a slight sliding movement with respect to the needle.

The defendant Silberman was unable to get sufficient or fast enough movement of the eyes from the cam of Exhibit 2, and then he designed Exhibit A, and defendants have supplied it to the trade.

What the defendant Silberman really designed was the attachment, Exhibit D, because the sewing machine is a standard Singer machine with the attachment mounted thereon.

The elements of the defendants' machine in addition to the standard Singer machine are a gear secured to the main shaft of the sewing machine, which meshes with a gear on

the first shaft of the attachment, a crank pin on the end of the first shaft which, when the first shaft revolves, engages a link which carries a vibrated, serrated arm and causes it to rise and fall, a second shaft parallel with the first, which makes six revolutions for each turn of the first shaft, a crank pin on its end, and a slide block mechanism which causes a vibrating, serrated arm to move backwards and forwards six times for each rise and fall of the vibrating arm.

The vibrating arm is not in any way synchronized with the feed or needle bar, nor is it of any specified length or position of the serrations with repsect to the needle.

The operation of the defendants' machine is different from that of the plaintiff.

In the defendants' machine the eyes are never brought to a position of full stop at any premeasured distance in advance of the sewing point or otherwise, but the machine moves the eye with which the serrated plate is engaged backwards and forwards six times for each stroke of the needle.

This serrated arm is constantly moving from 15,000 to 18,000 times per minute in its horizontal travel, moving the eye with it at the same rate of speed. It is never stopped or at rest in the operation of the machine, but works on every stroke of the needle and keeps the eyes in constant motion so that if the needle should hit an eye, the blow would be but a glancing one and not one which would break either the needle or the eye.

Plaintiff's observation of the moving picture demonstration differed from that of the court, and I do not believe that the up and down swinging arm and its notched eye engaging plate is a stop device, the real function of which is to keep the eye out of the path of the needle and to prevent shifting of the eye, thus governing or controlling the same as it moves toward and past the sewing mechanism for the identical purposes the invention of the patent in suit sought to serve.

To me it seems clear that both in construction and operation of the device of the patent in suit and the defendants' devices, the principles on which they proceed are fundamentally different.

To keep the eye clear of the needle, the patent in suit stops the eye, while to accomplish the same purpose the defendants' machine keeps the eye in constant motion.

To establish infringement of a patent for a combination of elements, it is not enough to point out substantially the same elements in combination in defendants' structure, but it must also be shown that the defendants' system performs substantially the same function in substantially the same way as complainant's, and where the result is obtained by a new combination, operating on different principles, and constituting a radical departure from complainant's patent, there is no infringement. Safety Car Heating & Lighting Co. v. Gould Coupler Co. (D. C.) 245 F. 755.

I have not considered the claimed superiority or capability of defendants' machine for more extended use in various kinds of work, because if the defendants' machine operated on the same principle and performed the same functions by analogous means, or equivalent combinations, that would not negative infringement. Norton v. Jensen (C. C. A.) 49 F. 859; International Time Recording Co. v. W. H. Bundy Recording Co. (C. C. A.) 159 F. 464.

The test is: Does the defendants' machine perform substantially the same function in substantially the same way to obtain the same result as the machine of the patent in suit? Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935. In my opinion it does not, because what the patent in suit seeks to accomplish by a positive stop, the defendants' machine accomplishes by constant motion.

I am unable to find in the defendants' machine "an automatic positive stop means cooperative with the fasteners on the tape for governing the movement of the tape to said sewing mechanism," or the equivalent thereof, and as that is an essential element of claims 1, 6, and 29 of the patent in suit, which are all the claims at issue, the defendants have not infringed the patent in suit.

A decree may be entered dismissing the bill, with costs against the plaintiff.