## PENMAC CORPORATION v. ESTERBROOK STEEL PEN MFG. CO.

District Court, S. D. New York.
March 31, 1939.

Frederic P. Warfield, of New York City, for plaintiff.

Howson & Howson, of New York City (Charles H. Howson, of Philadelphia, Pa., of counsel), for defendant.

WOOLSEY, District Judge.

My judgment in this cause is:

■ 1. That Claims Nos. 1, 2, 24, 25, 26, 28, 29, 30, 36 and 37 of United States Patent No. 1,866,072, and Claims Nos. 6, 7, 10, 12 and 13 of United States Patent No. 1,928,042 are valid and were infringed by the defendant herein.

■ 2. That Claims Nos. 4, 15, 16 and 21 of United States Patent No. 1,700,255, Claim No. 33 of United States Patent No. 1,700,246, and Claim No. 7 of United States Patent No. 1,700,257 are invalid for lack of invention over the prior art.

3. That, accordingly, there should be an interlocutory judgment for the plaintiff providing for the usual injunction, carrying costs, and referring the cause to a master to report to this Court on the damages suffered by the plaintiff by reason of the matters alleged in this cause, and the profits made by the defendant from January 25, 1935, the date of notice to it of the infringement herein found.

4. That the costs allowed to the plaintiff shall include all taxable disbursements and allowances.

I. My subject matter jurisdiction is based on the Patent Law, Title 28 United States Code, Section 41(7), 28 U.S.C.A. § 41(7).

There is not any question of venue.

There is not any question involved as to the plaintiff's locus standi to maintain this suit for it owns all the five patents involved.

■ II. In view of the decision of the United States Supreme Court rendered April 25, 1938, on Equity Rule 70½, 28

U.S.C.A. following section 723, in Interstate Circuit, Inc. v. United States, 304 U. S. 55, 56, 57, 58 S.Ct. 768, 82 L.Ed. 1146, and under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it is now a work of supererogation to write a considered and detailed opinion on the facts in what used to be an equity cause and is now called a non-jury cause, for the place of the opinion must now be taken by formal findings of fact and conclusions of law, separately stated and numbered. Title 28 United States Code, Section 723, 28 U.S.C.A. § 723.

I shall, therefore, content myself with dealing herein merely with certain general aspects of the facts, and with the conclusions of law which I draw therefrom, and leave it to the attorney for the plaintiff to submit, in accordance with my instructions at the end of this opinion, such findings of fact and conclusions of law, separately stated and numbered, as he may be advised.

III. This suit is founded on claims—contained in five patents—for a combination constituting a magazine pencil which will feed its lead step by step.

The claims involved in this cause are as follows:

A. In the patent—referred to throughout the trial as Woelm No. 1—applied for on September 16, 1922, and granted on July 5, 1932, as United States Patent No. 1,866,072:

"1. In a lead pencil, the combination of a cylindrical holder with conical mouth piece, a compartment for containing strips of lead in said holder, a guide-tube for leading said lead strips to said mouth piece, a gripping device reciprocal in said holder and adapted to grip and feed forward a lead when moved downward, and to release its grip thereon when moved upward, and a spring normally forcing said device to grip a lead in said guide tube.

"2. In a magazine pencil, the combination of a cylindrical holder with conical mouth piece, a compartment in said holder for containing strips of lead, a guide tube for leading said lead strips to said mouth piece, a gripping device reciprocable in said holder and adapted to grip and feed forward a lead when moved downward, and to release its grip thereon when moved upward, and a spring normally causing

said device to hold a lead in said guide tube.

\* \* \* \* \* \*

"24. In a magazine lead pencil including a casing, the combination of means providing a magazine chamber in the upper portion of the pencil, means for guiding a lead from said chamber to the lower end of the pencil, longitudinally movable lead-propelling mechanism including a lead-gripping jaw and a camming member positioned beneath said magazine, a spring acting on said camming member to force said mechanism in one direction, and means operable from the outside of the casing for moving said mechanism in opposition to said spring.

"25. A magazine lead pencil, comprising a casing and lead-propelling mechanism including releasable lead-gripping means, a longitudinally movable gripper-operating element, a spring bearing against said gripper-operating element and tending to oppose movement of said operating element in one direction, and means including an exteriorly accessible element to move said gripper-operating element in opposition to said spring.

"26. In a magazine lead pencil including a casing, a lead guide-tube, releasable lead-gripping means, and operating mechanism including a longitudinally movable gripper-operating element slidable on said guide-tube, a spring tending to oppose the movement of said gripper-operating element in one direction, and means including an exteriorly accessible element for moving said operating element in opposition to said spring.

\* \* \* \* \* \*

"28. In a magazine pencil including a casing, the combination of means providing a lead magazine in the upper end of the pencil, a slotted lead guide-tube for conducting leads downwardly from said magazine, releasable lead-gripping means extending through the slotted portion of said guide-tube, longitudinally movable gripper-operating mechanism including a longitudinally movable element slidable on said guide-tube, a spring acting against said longitudinally movable element for causing the same to move said gripper into gripping engagement with a lead, and means including an exteriorly accessible element for moving said longitudinally movable element in opposition to said spring to permit the release of said gripping means.

"29. In a magazine pencil including a casing, the combination of means including a lead magazine in the upper end of the pencil, a slotted lead guide-tube for conducting leads downwardly from said magazine, lead-propelling means including longitudinally movable releasable lead-gripping means extending through the slotted portions of said guide tube, and operating mechanism including a spring tending to oppose movement of said gripping means in one direction, and means including an exteriorly accessible element for moving said gripping means in opposition to said spring.

"30. In a magazine pencil including a casing, the combination of means including a lead magazine in the upper end of the pencil, a slotted lead guide-tube for conducting leads downwardly from said magazine, lead-propelling means including longitudinally movable releasable lead-gripping means extending through the slotted portion of said guide tube, and operating mechanism including a longitudinally movable camming element and a spring tending to hold said camming element in camming position, and means including an exteriorly accessible element for moving said camming element in opposition to said spring.

\* \* \* \* \* \*

"36. In a magazine lead pencil including a casing, the combination of releasable lead-gripping means, a camming element adapted to be moved to a position wherein it holds the lead-gripping means in engagement with the lead, a spring bearing directly upon said camming element and tending to move said camming element to such position, and means for moving said camming element in opposition to said spring to permit a release of said grippers.

"37. In a magazine pencil including a casing, the combination of means including a lead magazine in the upper end of the pencil, a slotted lead guide-tube for conducting leads downwardly from said magazine, lead-propelling means including longitudinally movable releasable lead-gripping means extending through the slotted portion of said guide-tube, a camming element adapted to be moved to a position wherein it holds the lead-gripping means in engagement with the lead, a spring tending to move said camming element to such position, and means for moving said camming element in opposition to

said spring to permit a release of said grippers."

B. In the patent—referred to throughout the trial as Woelm No. 2—applied for on September 16, 1922, and split in the Patent Office from the previous patent by a division of the application therefor, and granted on September 26, 1933, as United States Patent No. 1,928,042:

"6. In a step-by-step lead pencil, a plurality of longitudinally movable lead grippers, resilient means tending to spread said grippers, a longitudinally movable gripper-operating member arranged to normally maintain said grippers in engagement with a lead in the pencil and when reciprocated to impart movement to said grippers and to press said grippers against a lead during the major part of their downward movement, and resilient means adapted normally to press said longitudinally movable member against said grippers.

"7. In a step-by-step lead pencil, a longitudinally movable member, a plurality of longitudinally movable lead-gripping jaws, a spring-pressed member acting normally to cause said lead-gripping jaws to grip a lead therebetween for writing purposes, and means to reciprocate said jaws in response to the movement of said longitudinally movable member.

\* \* \* \* \* \*

"10. In a step-by-step pencil including a casing, a longitudinally movable lead-gripping unit including a plurality of outwardly spring-pressed jaws, a longitudinally-movable spring-pressed operating member tending to thrust said jaws toward each other and against a lead in the pencil in opposition to their springs, and exteriorly accessible means for moving said operating member in opposition to its spring.

\* \* \* \* \* \*

"12. In a step-by-step pencil, a slotted lead guide tube, a plurality of outwardly spring-pressed grippers formed with cooperating jaw portions adapted to extend within the slots in the guide tube to grip a lead therein, said grippers and said tube being mounted for relative longitudinal movement, a gripper-operating member longitudinally slidably mounted with respect to said guide tube and said grippers, a spring normally acting longitudinally of the pencil to hold said gripper-operating member in jaw-closing position, and actuating means for causing relative longitudinal movement of the parts and for

compressing said spring to permit the release of said jaws.

"13. In a step-by-step pencil, a slotted lead guide tube having a lead-holding portion at its lower end, a plurality of outwardly spring-pressed grippers formed with cooperating jaw portions adapted to extend within the slots in the guide tube to grip a lead therein, said grippers and said guide tube being mounted for relative longitudinal movement, a gripper-operating member longitudinally slidably mounted with respect to said guide tube and said grippers, a spring normally acting to press said operating member downwardly to hold said gripper-operating member in jaw-closing position, and actuating means for causing relative longitudinal movement of the parts and for compressing said spring to permit the release of said jaws."

C. In the patent—referred to throughout the trial as Feldman No. 1—applied for on October 23, 1922, and granted on January 29, 1929, as United States Patent No. 1,700,255:

"4. A guide tube for guiding leads from the magazine of a mechanical pencil to the delivery point thereof, and consisting of a tube of suitable material the upper and major portion of which has a bore the minimum diameter of which is considerably greater than that of the lead to be guided, and in the walls of which are longitudinal slots adapted to pass and permit reciprocable movement therein of the grippers which form a part of the pencil mechanism; the lower and remaining portion of the tube contracted to and having a substantially uniform inner diameter but slightly greater than the diameter of the lead to be guided, the lower end of the tube slotted to form a plurality of fingers the free ends of which are rolled inward until the opening therethrough is slightly smaller than the lead to be guided.

\* \* \* \* \* \*

"15. In a step-by-step magazine lead pencil, the combination of a tubular casing in two parts, one slidable within the other, means to provide in the upper part of said casing a magazine space adapted to contain a plurality of leads, means to provide a discharge opening in the lower end of the lower part of the casing, means providing a passageway opening into the bottom of said magazine whereby a lead will automatically drop into said passageway whenever the rear end of the lead therein passes below the entrance thereto, a

spring-controlled lead-gripping and-feeding unit reciprocable in said casing intermediate said magazine and said discharge opening, the controlling spring of said unit resisting longitudinal displacement of the parts of said casing, and means whereby the longitudinal displacement of a part of said casing, first in opposition to, and then under the urge of said spring, will impart a reciprocating movement and lead-releasing and-gripping actions to said mechanism whereby a lead will be fed step-by-step through the pencil.

"16. In a step-by-step magazine lead pencil, the combination of telescoping upper and lower tubular casing members, means to provide a lead magazine in the upper casing member, means to guide a lead downwardly from said magazine to the lower end of the pencil, a reciprocable lead-gripping unit including a plurality of lead-gripping jaws, normally gripping a lead in transit from the magazine to the lower end of the pencil, and means comprising a spring-controlled member adapted to cause lead-gripping and-feeding action of said gripping unit in response to the relative longitudinal displacement of said casing members whereby the lead will be fed step-by-step through the pencil.

\* \* \* \* \* \*

"21. In a step-by-step lead pencil, the combination of a plurality of lead-grippers, a spring-pressed member acting normally to cause said grippers to grip a lead for writing purposes, means forming a part of the pencil casing for moving said spring-pressed member against the pressure of its spring, means to move said grippers out of engagement with the lead, means to move the grippers upwardly along the lead, and means comprising said spring-pressed member to return the grippers to gripping position and to feed forward a lead."

D. In the patent—referred to throughout the trial as Woelm No. 3—applied for on June 1, 1923, and granted on January 29, 1929, as United States Patent No. 1,-700,246:

"33. In a step-by-step pencil, the combination of a casing, a lead-gripping, and-feeding unit reciprocable within said casing and comprising a plurality of lead-gripping jaws, and a spring-pressed member formed with an inclined surface in the path of movement of said gripping unit for causing a lead-gripping action by said jaws, and means including said spring-pressed member to cause said jaws to propel a lead step-by-step through the pencil."

E. In the patent—referred to throughout the trial as Feldman No. 2—applied for on March 3, 1924, and granted on January 29, 1929, as United States Patent No. 1,700,257:

"7. In a step-by-step lead pencil, the combination of a plurality of vertically-movable lead-grippers, resilient means tending to move said grippers out of engagement with a lead in the pencil, a vertically-movable fitting adapted to fit about said grippers and to close the same, a spring normally forcing said fitting against said grippers, means to impart vertical movement to said fitting, and means to delay movement of said grippers in response to movement of said fitting."

IV. As I understand it, we have a common ground, namely, that there is not in the prior art any one patent that could properly be called an anticipation of any of these patents.

So all we are dealing with here is to what extent the patents of Woelm and of Feldman, if he properly secured any patents, emerge by process of invention from the prior art.

V. All these patents were co-pending in the Patent Office, and, consequently, we must consider the effect of such co-pendency.

At this point, although dates of application and granting have been mentioned above, a schedule will be of convenience:

| Patent | Applied for | Granted |
| --- | --- | --- |
| Woelm Patent No. 1,866,072, called at trial Woelm No. 1 | September 16, 1922 | July 5, 1932 |
| Woelm Patent No. 1,928,042, called at trial Woelm No. 2 | September 16, 1922 | September 16, 1933 |
| Feldman Patent No. 1,700,255 called at trial Feldman No. 1 | October 23, 1922 | January 29, 1929 |
| Woelm Patent No. 1,700,246 called at trial Woelm No. 3 | June 1, 1923 | January 29, 1929 |
| Feldman Patent No. 1,700,257 called at trial Feldman No. 2 | March 3, 1924 | January 29, 1929 |

Thus it will be seen that Woelm No. 1 and Woelm No. 2, which were applied for as one and split in the United States Patent Office, were the first in the field of the patents here involved.

■ Under the teachings of the decision of the Circuit Court of Appeals in Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259, certainly Woelm's Patents No. 1 and No. 2 do not rank as prior art over Woelm's Patent No. 3, because the applications for them were made by one person; but Feldman's Patent No. 1 was dovetailed in between Woelm No. 2 and Woelm No. 3, and so was prior art to Woelm's No. 3, for it is settled law, as I understand it, that in patents co-pending on applications by different persons, the prior application is in the prior art. See Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 401, 402, 46 S.Ct. 324, 70 L.Ed. 651; Naceskid Service Chain Co. v. Perdue, 6 Cir., 1 F.2d 924, 925; Lemley v. Dobson-Evans Co., 6 Cir., 243 F. 391, 395, 397; Hazeltine Corporation v. Radio Corporation, D.C., 52 F. 2d 504, 509; Yale Hook & Eye Co. v. Interwoven Hook & Eye Co., D.C., 33 F.2d 295, 297, 298.

The result is that Feldman's Patents No. 1 and No. 2, as to the claims of Feldman's patent relied on here, are not, in my opinion, instances of invention over Woelm's earlier applications which were in the prior art; and Woelm's No. 3, applied for after Feldman, was not any invention over Feldman No. 1, for it did not, in my opinion, involve any real patentable advance in the art.

Then, of course, Feldman No. 2 finds not only Woelm No. 1 and No. 2, but also Woelm No. 3, in the prior art; I find, therefore, that the claim of Feldman No. 2 here relied on does not involve any invention over the prior art as shown by Woelm No. 1, No. 2 and No. 3.

That means that I hold that the Woelm Patents No. 1,866,072 and No. 1,928,042 involve an inventive advance over the prior art as it then stood, but that the other three patents, Feldman No. 1,700,-255, Woelm No. 1,700,246 and Feldman No. 1,700,257, are invalid for want of invention over the prior art at the time of their applications.

VI. I think that confessedly the defendant's best, and, perhaps, only serious prior art reference on the question of validity is the Hacker Patent No. 294,317.

I have carefully examined the model of the Hacker patent and the drawings, and also the model of the defendant's pencil.

I have satisfied myself by manipulating the models and feeling the effect on the leads at various stages, that the gripper jaws of the Hacker patent do not propel the lead through the lead guide-tube, but they hold it when the pencil is in writing position. The lead in the Hacker patent is pulled forward, I find, by the friction ring at the writing tip of the pencil.

Hacker, therefore, does not dilute Woelm's invention in any way, and the claims relied on in Woelm No. 1 and Woelm No. 2 are valid.

It would be quite impossible in any opinion of reasonable length to deal with the details of these patents. I shall leave that to the drawings and to the findings of fact if it is desired to develop such details therein.

VII. The five patents here in question occupy a field of the useful arts in which, it seems to me, there have been many developments during the last fifteen or twenty years. And in view of the ingenuity of the interior mechanism of the pencils involved, I feel that I am showing some temerity in attempting to decide this case so soon after the argument, but a prompt decision when possible is always the best practice if questions of fact are involved,—especially such elusive questions as the interaction of the little elements in these pencils which constitute the basis of the successful operation thereof.

All these patents are aimed at securing a satisfactory magazine pencil, that is, a pencil which will hold a number of leads and which will feed those leads step by step to the writing point thereof.

. The construction of each of the pencils disclosed by these patents may, perhaps, be adequately described by saying that, commencing at the outside, it consists—

1. Of an outer casing of appropriate length for writing, tapered at the writing end;

2. Of the mechanism by which the lead is fed to the writing point—a system of grippers and camming members;

3. Of means for manipulating this mechanism from the outside—by a slide or by a trigger, or by elongating the pencil case by pulling at its end, or shortening it by pressing thereon;

4. Of a spring or springs to ensure return of the interior mechanism to its writing position; and

5. Of a guide tube for the lead, so slotted as to enable the grippers when actuated by the camming member so to reach and seize the lead that its propulsion through the guide tube towards the writing end of the pencil for a predetermined distance may be achieved.

The special objective of these patents lies in this feeding process by which the lead is propelled through the lead guide-tube for a short distance towards the writing end of the pencil.

It seems to me that it matters not by what manipulation the mechanism devised to achieve this objective is actuated. It is the mechanism within the pencil casing which counts, and it is necessary that there should be a properly timed interaction between the camming element and grippers which seize and hold the lead.

In the mechanism, consisting of those elements, lies, to my mind, the invention disclosed in such of the claims of these patents as I have sustained.

VIII. That there was invention in the devices of the plaintiff's patent is further proved by the fact that for many years persons have been trying to make a magazine pencil that—holding a supply of leads in a magazine chamber—would feed them step by step.

The Wahl Company, which is, I understand, one of the largest manufacturers of pencils in the United States, has been trying since 1931 to get a magazine pencil which would be satisfactory.

In order to start the manufacture of such a pencil without running the risk of infringing the Penmac patents, it secured a license from the Penmac Corporation, or its predecessor, and bought up certain other patents which it regarded as wise to have in its patent portfolio.

It was only by continuous experimental work that the Wahl Company finally succeeded in making a satisfactory commercial magazine pencil. It secured the license under the Penmac patents on December 7, 1934, and is still operating under that license. Its mechanics took the Penmac patents and, being free to use them, made thereon mechanical improvements and improvements in design. The result was the magazine pencil, now on the market, which is sold under the trade name of "Eversharp".

The fact that the devices of the plaintiff's patent are not without commercial value is shown by the success of the "Eversharp" pencil. This "Eversharp" magazine pencil was first put on the market early in August, 1936, and since that time the Wahl Company has manufactured and sold about 1,250,000 of these pencils at a price from $1.50 up. Its market has been in this country and in every country in the world except Germany, Russia and Japan.

We have here, therefore, the case of the awareness of the trade that there would be a demand for a magazine pencil, of many persons trying to manufacture a successful magazine pencil, and of the first commercially successful magazine pencil manufactured, embodying the propelling devices of the Penmac patent in suit here.

This gives good objective proof of the inventive quality involved in the plaintiff's first two patents, which contained the essential parts of its disclosed devices, namely, the camming member co-acting with gripper jaws which propelled the pencil through the lead guide-tube towards and out of the writing point of the pencil casing.

Indeed, I think that the patents, Woelm No. 1 and Woelm No. 2, may fairly be called pioneer patents in the magazine pencil art.

IX. Then we come to the question of whether the defendant has infringed.

I segregate the defendant's device from the prior art which it seeks to invoke for its defense by finding that the jaws of the grippers in the defendant's pencil, about which I will not go into in detail, do propel the lead thereof through the lead guide-tube. The distance of such propulsion is, as measured on the model thereof, precisely the distance between the forward or writing point end of the grippers and the place where they are stopped by the bottom of the defendant's camming device.

I do not think it makes the slightest difference by what manipulation the movement of the different interior parts of the pencil are made to co-act with each other, or the order of such co-action, because the objective is to propel the lead a certain prearranged distance through the lead guide-tube towards or out of the writing point.

It cannot, in my opinion, make the slightest difference how that propulsion is arrived at, or whether the lead guide-tube be fixed in the casing or be arranged longi-

tudinally to reciprocate therein, if there are within the pencils the same mechanical types of members operating to cause that propulsion.

That is the reason, in my opinion, why the defendant has infringed on the claims of two of the plaintiff's patents—the two Woelm patents which I have held valid—because it seems to me that—look at it how you may—the defendant reaches the same result as the plaintiff in substantially the same way.

X. Next, I must give you the procedure which counsel must follow in submitting to me—through the Clerk's office—the findings of fact and conclusions of law.

Remember that these are to be findings of essential facts. I do not have to, and I will not, find every little bit of evidence. Counsel should submit findings of the essential aspects of the facts only. It might be sufficient for me herein to say "I find the claims of this patent are valid", and "I find that they have been infringed", but I think it is appropriate that there should be a little more flesh and blood put into the findings, and, so, my instructions about the findings of fact are these:

Counsel for the plaintiff must submit to me, through the Clerk's office, findings of fact and conclusions of law not contrary to this opinion, and must give, since counsel for defendant comes from out of town —ten days' notice thereof to him. Counsel for defendant may on the return day of such notice, when the findings are to be submitted to me, submit criticisms of the findings of fact proposed by the plaintiff's counsel, if he wishes to do so.

All proposed findings submitted must be typed in triple spacing so that I may conveniently correct them, if I wish to do so.

Under Rule 52(a) only the findings of fact and conclusions of law which I sign will be included as part of the record on appeal herein. We do not have counter findings of fact because nobody wants or needs them, and objections to my findings may be hereafter taken by assignment of error on appeal.

XI. After the findings of fact and conclusions of law are signed by me, an interlocutory decree, including all taxable disbursements and allowances, may be submitted to me by the plaintiff's attorney through the Clerk's office. Such interlocutory decree will provide for the usual injunction and for a reference to a master to find the damages suffered by the plaintiff, and the profits made by the defendant from January 25, 1935, the stipulated date of the notice of infringement herein.