INTERNATIONAL STEEL· WOOL CORPORATION v. WILLIAMS CO.

No. 1242.

District Court, S. D. Ohio, E. D.

Dec. 18, 1941.

---

Marston Allen and E. S. Allen, of Allen & Allen, all of Cincinnati, Ohio (Paul A. Staley, of Springfield, Ohio, and Lytle G. Zuber, of Columbus, Ohio, of counsel), for plaintiff.

A. L. Ely of Ely & Frye, all of Cleveland, Ohio, and John M. Cole, of Cole & Hodge, all of Springfield, Ohio, for defendant.

NEVIN, District Judge.

This is a suit under the patent laws of the United States. The patent in suit is No. 1,907,453, granted May 9, 1933, to William A. Steinbart on application filed November 27, 1923, renewed August 17, 1925. It was assigned to International Steel Wool Corporation of Springfield, Ohio, plaintiff herein, before issuance, and since then plaintiff has had, and now has, legal title thereto. It is for "Method of and machine for making steel wool". It contains 38 claims.

Plaintiff and defendant are both Ohio corporations. Plaintiff's principal place of business is in Springfield, Ohio, defendant's in London, Ohio. Each is engaged in the business of manufacturing commercial steel wool.

Plaintiff filed its Bill of Complaint on July 11, 1938, charging defendant with infringement and prayed for an injunction and an accounting.

Subsequently, to-wit: on October 14, 1938, plaintiff filed a bill of particulars wherein it is recited that the claims of the patent in suit upon which it "intends to rely in support of the charge of infringement are claims 5, 16, 17, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 30, 31, 34, 35, 36, 37 and 38." Later, at the trial, plaintiff elected to stand on four claims only, to-wit: Claims Nos. 17, 23, 29 and 34, saying in its brief (P.1): "Claims 17, 23 and 29 for mechanism, and claim 34 for a method are relied upon for purposes of this suit."

On October 20, 1938, defendant filed its Answer, and at the same time and in connection therewith, a Counterclaim. In its Answer defendant denies infringement and alleges the invalidity of Patent No. 1,907,453 on several grounds, among others, lack of invention over the prior art.

At the close of the evidence (Rec. P. 633) defendant moved to dismiss its counterclaim without prejudice. Plaintiff urged its dismissal with prejudice. It was agreed (Rec. P. 634), therefore, that the "form of the dismissal" should be determined later.

In its brief (P. 56) defendant states: "It having been demonstrated, largely upon issues and evidence not before the Patent Office in the Interference proceedings, that there is no invention in the subject matter of this suit, defendant withdraws its motion to dismiss its counterclaim without prejudice, and agrees that it may be dismissed with prejudice."

In view of the foregoing, no further consideration need be given the counterclaim, and it is here dismissed with prejudice.

The parties to this suit were the parties to an interference in the U. S. Patent Office entitled Robbins vs. Steinbart. The interference resulted in the grant of claim 23, (here in suit) to Steinbart. Defendant owns patent No. 1,584,145 (the patent involved in the counterclaim herein) granted to William H. Robbins, application for which had been filed after the Steinbart application, but which did not get into interference with the Steinbart application until after the patent had been granted to defendant. The Court of Customs and Patent Appeals held in favor of Steinbart as first inventor. Robbins v. Steinbart, 57 F.2d 378.

The art of steel wool making came from Germany or German Switzerland (Rec. P. 575) where it was known in the early days as "Stahlspanen." [1]

---

[1] See Muller Swiss patent No. 22,589; Marti Swiss patent No. 32,668; Graf-Buchler German patent No. 147,758; Graf-Buchler Swiss patent No. 28,187; Graf-Buchler Austrian patent No. 13,-466; Graf-Buchler Circular, Deft's Ex. 66; and the old German dictionaries, Deft's Exs. 67, 68 and 69.

In his patent Steinbart says that his invention "has for its object primarily to provide a method of and machine designed to be employed for making steel wool for use in various arts mainly for cleaning and polishing metal, and which is of a form whereby the wool may be cut with unusual facility, in order to permit of the production of large quantities within limited periods as occasion may require.

"A further object * * * resides in the provision of a method and apparatus for making metal wool wherein a length of wire may be fed and guided through an apparatus in a unidirectional way and reduced to attenuated condition by a single run through the apparatus, thus enabling a much greater quantity of wool to be made in a given length of time than by other methods and apparatus and also obviating the necessity of numerous reversals in the direction of travel of the wire from which the wool is formed.

"Other objects * * * are to provide means operative for adjusting the adjustable rotary member toward and from the other rotary member; to provide means operative by the operation of the driving means whereby the cutters will be moved determined distances across the convolutions of the wire when transmitted; and to provide a machine for making steel wool of simple, efficient and durable construction adapted to be made in appropriate sizes and shapes."

Steinbart says (Pat. P. 1 Ex. 501) that the apparatus employed in carrying out his invention "contains a frame in which are mounted two spaced apart grooved rotary drums both driven at the same speed for feeding and guiding the wire from which the wool is made in a series of convolutions, together with a plurality of cutters arranged to engage the convolutions of wire for cutting the wire into fine fibrous portions during transmission of the wire, the cutters being of sufficient number to reduce the wire to attenuated condition during a single unidirectional travel of the wire."

It appears that for many years it had been the practice to wind the wire from one drum onto another and then reverse the drive and wind it back again, thereby drawing the wire beneath the cutting tools. In part of the path of the wire there was a cutting table such as a grooved metal bar, and the wool cutting knives were set to bear against the wire moving in the grooves of the metal bar, the knives being double ended and arranged to be reversely tipped as the wire moved to and fro. Originally a single strand of wire was used and a series of knives in a row along the table. Later an idler wheel was placed at the ends of the table and the wire drawn once around these wheels to make two strands on the table.

Steinbart proposed a wool cutting system in which the wire was caused to pass through a large number of loops, each of which was independently driven, and plaintiff asserts that "The inventive concept claimed is the use of independent drive for each of a series of loops in the cutting of steel wool by means of multiple cutters applied to the strands formed by the looping. Then, as in claims 17 and 34, the number of cutting operations can be extended to cut the wire down to attenuated or scrap condition in a single operation without reversal of the machinery. The essence is in claims 23 and 29 and the ultimate in claims 17 and 34."

The claims just referred to (Nos. 17, 23, 29 and 34 being the claims now in suit) read as follows:

"17. In a machine for making metal wool, a plurality of feeding and guiding rolls arranged in parallel relation, said rolls acting to feed and guide a wire in a series of convolutions, means other than the wire for rotating said rolls at the same speed, and cutters acting upon said convolutions of wire during their travel about said members to cut fibrous shavings therefrom, said cutters being of sufficient number to gradually reduce the wire to attenuated form during a single continuous travel of the wire past the cutters."

"23. In a machine for manufacturing steel wool, a table, cutting tools arranged adjacent thereto, means to guide a plurality of parallel strands formed from a single wire in engagement with said tools over said table, and means to drive said guiding means so that each loop of wire will be independently driven by said guiding means whereby the driving strands will be applied to each loop independently against the resistance of the tools engaging the strand of wire of that loop."

"29. In a machine for manufacturing steel wool, a support, cutting tools arranged adjacent thereto, means about which a plurality of parallel strands of

wire formed from a single wire pass, power-operated means for driving at least a part of said means whereby the driving strands will be applied independently to each loop of wire, and a plurality of cutting tools to engage the loops of wire."

"34. The method of making metal wool consisting in causing a length of wire to travel at all times in a unidirectional way from a point of supply to a point of discharge in the form of a series of convolutions by applying a feeding action directly to the convolutions, and applying to the convolutions a series of cutting operations sufficient to reduce the wire to an attenuated condition by a single unidirectional travel of the wire."

Defendant submits that "the Steinbart patent in suit is wholly inoperative as a steel wool making machine. In order to manufacture steel wool, it is essential that adequate and proper cutting tools be provided; that the tools be rigid and that the micromatic adjustments be provided to compensate for the almost imperceptible reduction of the wire as the delicate filaments are removed from the top of the wire; that the wire be firmly held in position under the tools and that there be no rocking of the wire. None of these essentials is found in the Steinbart patent."

While not conceding that the device of the patent in suit is inoperative plaintiff asserts (Br. P. 56) that even so "To be inoperative so as to be invalid as a patent, the structure shown must be such as to require the act of an inventor to make it work", and that "the Court of Customs and Patent Appeals said that the Steinbart patent document was sufficient because they said if there were defects in the structure they could be readily remedied by a mechanic skilled in the art."[2]

It is conceded that no machine such as is shown and described in the Steinbart patent was ever built or used.

■ Defendant contends that "All of the claims of the Steinbart patent in suit (17, 23, 29 and 34) are wholly devoid of invention. They involve nothing more than the application of an old machine operation to procure an obvious and well-known result; or the exercise of rudi-mentary skill in the adoption of an expedient which had long been employed in the kindred operation of wire drawing to accomplish exactly the same results in exactly the same way. This is a mere double use or extension of an old idea to a closely related industry or environment. This is not invention." With this contention and conclusion of defendant, the court agrees. Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F.2d 199–203.

■ Nor is defendant estopped by the interference proceedings from here contesting the validity of Claim 23. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464-477, 55 S.Ct. 449, 79 L.Ed. 997; Haughey v. Lee, 151 U.S. 282, 14 S.Ct. 331, 38 L.Ed. 162. (None of the other claims in suit was involved in the said interference).

As its views are fully expressed in its findings and conclusions hereinafter set forth, the court deems it unnecessary to here discuss further many questions presented in the briefs and arguments of counsel. Penmac Corp. v. Esterbrook Mfg. Co., D.C., 27 F.Supp. 86, 87.

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the court has arrived at the following:

### Findings of Fact.

1. Plaintiff, International Steel Wool Corporation, is a corporation of Ohio, having its office and principal place of business at Springfield, Clark County, Ohio; defendant, the Williams Company, is a corporation of Ohio, having its office and principal place of business at London, Madison County, Ohio, at which place the alleged acts of infringement have taken place.

2. This is a patent suit based upon Steinbart patent No. 1,907,453, granted May 9, 1933, upon an application filed Nov. 27, 1923, renewed August 17, 1925. The patent was assigned to plaintiff before issuance and title thereto is in plaintiff.

3. Plaintiff and defendant are both engaged in the manufacture of commercial steel wool at their respective places of business.

4. With its Answer, defendant filed a counterclaim on Robbins patent No. 1,-

[2] The Court of Customs and Patent Appeals (57 F.2d 378) stated at page 382: "We think that the features of the Stein-bart device responsible for its alleged inoperativeness could have been corrected without the exercise of inventive skill."

584,145, charging that plaintiff infringed claims 17, 18, 28, 55 and 57 thereof. At the trial of the case, consideration of the counterclaim was deferred until the conclusion of plaintiff's case, whereupon defendant moved to dismiss the counterclaim without prejudice and later consented to dismissal of the counterclaim with prejudice.

5. In response to a motion for Bill of Particulars, plaintiff charged that defendant infringed claims 5, 16, 17, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 30, 31, 34, 35, 36, 37 and 38, but at the trial of the case plaintiff elected to stand on claims 17, 23, 29 and 34 only.

6. The patent in suit is for a machine for the manufacture of steel wool and the method of making steel wool. The patent shows a machine consisting of a base on which are mounted two vertical parallel pulleys about which a steel wire is wrapped in a plurality of parallel convolutions. The pulleys are grooved to receive the wire and are driven by a motor located in the base of the machine and connected to the shafts of the vertical pulleys. The patent shows 560 knives, each knife operating upon a single strand of wire, it being stated in the patent (P. 4) that this is a sufficient number to make, in one passage of the wire, all of the cuttings of steel wool which the wire will afford.

Projecting from the frame of the machine are blocks 89, 90 and 91 in which the wire is supported beneath the knives.

At the sides of the machine are located parallel guideways in which are supported vertical boards 80 upon which the knives 96 are mounted, these knives being intended to remove shavings from the wire. The boards 80 were, in accordance with the application as filed, reciprocated during the operation of the machine for the stated purpose of cross-cutting the wire. Steinbart joined the end of one wire to the next by a coupling 44 (Fig. 3) and provided lever mechanism to raise the several knives to permit the coupling to pass under the knives in succession. As described in the patent, when the several knives are lifted from the wire, adjacent knives will be lowered against the wire. By an interlocking connection between all of the levers on each board, as each knife is raised or lowered by the coaction of the coupling and the lever mechanism, all of the other knives on the same board will be raised (or lowered) simultaneously so that part of the knives will be either raised or lowered at all times. As the lever mechanism is carried by the reciprocating boards 80 and the wire is moving in a fixed path, any certain coaction between the coupling 44 and the lever mechanism would be impossible. As a result, even if the coupling could pass the blocks 89, 90 and 91, the coupling 44 would strike some if not all of the knives. This would either break the knives or stop the machine. No provision was made for adjusting the knives to compensate for the gradual reduction of the wire.

7. The patent is inoperative for the purpose of cutting wool. The only portions of the machine which are operative are the vertical pulleys and their power-driving means.

8. Plaintiff employs at its plant in Springfield, Ohio, two steel wool machines which are said to embody the Steinbart invention. These machines were shown to the Court during the trial of this case. They closely correspond with the patent to Galvin No. 1,977,053, issued Oct. 16, 1934, on an application filed June 29, 1925 (Deft's Ex. 82). The only features in common between the disclosure of the Steinbart patent and the International (Galvin) machines are the vertical power-driven pulleys about which the wire is passed. All of the remaining elements of the Steinbart patent have been discarded and in their places have been substituted the various elements of the Galvin patent.

9. Claims 23 and 29 are directed to the combination of the pulleys over which the wire is passed in a plurality of parallel convolutions and power-operated means to drive the pulleys and cutters; claims 17 and 34 specify that the wire shall be reduced to "attenuated" condition "during a single continuous travel of the wire past the cutters" (cl. 17), or "by a single unidirectional travel of the wire" (cl. 34).

10. As to claims 23 and 29, the only element of novelty is the application of power to wire guiding pulleys. These claims are invalid for lack of invention.

11. It was old in the prior art (as shown by the testimony of Plaintiff's witness Galvin), in the steel wool cutting machines employed at the Ridgely Trimmer

Company's plant in Springfield, Ohio, to employ a pair of grooved idler pulleys over which the wire was guided in two parallel convolutions while it was shaved by the knives to produce steel wool. A similar construction in which three convolutions were acted upon by the knives is shown in the Schonitzer Patent No. 1,-548,807, granted August 4, 1925, on application filed Feb. 18, 1922 (Ex. 52-11, Rec. P. 110).

12. In these prior art machines, the number of convolutions of wire acted upon by the several knives were so few that all of the pull upon the wire could be applied to the leading end of the wire. The pulleys in these prior art machines were, therefore, idler pulleys. It was obvious, however, that by driving the pulleys the force to propel the wire would be distributed along the wire rather than concentrated at the end of the wire, and the number of convolutions and consequently the number of cutting operations which could be performed at one time on the wire could be increased to any desirable extent.

13. It also was an obvious mechanical expedient to apply driving force to the idler pulleys of the prior Ridgely Trimmer or Schonitzer machines so as to distribute the propelling force along the wire rather than concentrating it at the exit end of the wire. (Plaintiff's expert, Mr. Galvin, testified that it was obvious to him as early as 1920 that if power were applied to the pulleys of the Ridgely Trimmer machines, with which he was familiar, the number of loops and, consequently, the number of cutting operations which might be performed upon a wire in a single passage could be multiplied to any desirable or practical extent. Rec. Pp. 564–566).

14. In the art of wire drawing (a related and analogous art), continuous wire drawing machines had for many years been constructed with parallel driven pulleys over which the wire was looped in a plurality of parallel convolutions. (This is shown by a number of prior patents, particularly the Lautzenheiser Patent No. 549,322, issued Nov. 5, 1895. (Ex. 52-6, Rec. P. 110). Machines such as shown in this patent were manufactured and sold in considerable quantities since 1900 or earlier by the Waterbury-Farrel Machine Company of Waterbury, Conn. One of these machines which was sold in 1914 to Platt Bros. of Waterbury, Conn. was introduced in evidence as Defendant's Ex. No. 18).

15. In wire drawing, as early as the date of the Lautzenheiser patent, it was found that if the wire were passed in a plurality of parallel convolutions over driven pulleys, the propelling force on the wire would be distributed along the wire and the number of drawing tools acting upon the wire could be multiplied to the point of continuous operation. This was the same expedient which was later adopted in the steel wool industry to secure increased production. The adaptation of this expedient from the wire drawing to the steel wool industry was a non-inventive act and accompanied by no new or unobvious result. (See the testimony of defendant's expert, Mr. Winkler, (Rec. P. 393) who was familiar with both wire drawing and steel wool making, and the testimony of Mr. Van Valkenburg, (Rec. Pp. 161–162) the engineer in charge of wire drawing at the Waterbury-Farrel Company).

16. The adaptation of the power-driven pulley idea from the wire drawing art was non-inventive. No changes or modifications were required to extend the idea of driven pulleys from the wire drawing art to the steel wool art.

17. The arts of wire drawing and steel wool making are kindred and analogous arts. Both relate to wire working and operatives in one art are familiar with the other. Various special features or attributes of the two operations do not affect the extension of the old idea to the new use.

18. Claims 23 and 29 are found to be anticipated by and devoid of invention over the Lautzenheiser patent No. 549,-322 (Ex. 52-6, Rec. P. 110) and the Waterbury-Farrel machine.

19. The various Graf-Buchler patents [3] anticipated the idea of distributing power along a wire in a steel wool machine so as to relieve the wire of the strain exerted by a plurality of cutters. In these patents the wire was wrapped about a

---

[3] U. S. Patent No. 761,585 (Ex. 52-9); German Patent No. 147,758 (Ex. 52-12); French Patent No. 321,028 (Ex. 52-13); Swiss Patent No. 28,187 (Ex. 52-15); Austrian Patent No. 13,466 (Ex. 52-17).

power-driven drum and at intervals between gangs of tools, rollers (shown as power-driven rollers in the U. S. patent) pressed against the wire, so as to overcome "the working resistance produced by the cutters." (U. S. Patent P. 1 L. 83). Whether the machines were for the purpose of making coarser shavings or finer shavings such as now known as "Steel Wool" is immaterial.

20. As it was old to distribute power along a wire in a steel wool cutting machine, for this additional reason, there was no invention in the application of the obvious expedient which was employed by Steinbart to accomplish the same result.

21. Claim 17 is drafted as an apparatus claim and claim 34 as a process claim. These claims refer to the reduction of the wire to "attenuated" form. In steel wool cutting operations which were performed on the old prior art machines, the wire was reduced to an "attenuated" form in a single continuous or unidirectional passage through the machine. The idea of a single continuous operation of a steel wool machine by which the wire is reduced to "attenuated" form without reversal of the wire, was anticipated by the Graf-Buchler patents referred to in Finding No. 19 hereof. (See Graf-Buchler Swiss patent No. 28,187, in which it is stated (Ex. 52-15, P. 1—Translation Ex. 53) that the wire is reduced "so that only a very small residue of wire remains when it leaves the machine.").

22. No degree of "attenuation" is defined in the specification or in claims 17 and 34. The claims do not specify that a full round wire must be reduced to the scrap point in one continuous, unidirectional movement, nor do they specify any grades of wool to be produced. No specific number of cutting operations is defined or definable. These claims do not define the size of the wire which is to be cut, the degree of "attenuation" to be reached, or the grades of wool to be cut, all of which are vital factors in determining the number of cutting operations. Claims 17 and 34 are void for indefiniteness.

23. Defendant's installation consists of a battery of eleven identical machines arranged in line, without any physical connection except a common drive shaft (see Deft's Ex. 83). Each machine comprises a pair of idler pulleys at the ends of the cutting table over which the wire passes in fifteen parallel convolutions. Each knife on a machine cuts all fifteen convolutions at one time. The wire is propelled by the so-called "cloverleaf drive" located above the cutting table on each machine. The wire passes from one machine to the next and then to the next and so on. Each machine performs the same operation upon the wire and the wire is progressively reduced by the sum of the operations of all of the machines. At the time of the inspection by the Court, there were 97 knives in the battery of machines, each cutting 15 wires or a total of 1455 cuts taken from the wire (Rec. P. 312). The wire was reduced from .103 to .013 of an inch in this operation (Rec. P. 313). If claims 17 and 34 are sought to be expanded to cover defendant's battery of machines, they are unpatentable as covering a mere duplication or multiplication of machines.

24. Defendant's installation of a battery of machines to do what it is claimed Steinbart did in one machine is a different means and mode of operation from the Steinbart patent. There is no infringement of these claims by defendant.

25. Any claim of commercial success is unwarranted by the proof. The Steinbart patent is inoperative as a wool cutting machine. No machine in accordance with the Steinbart patent was ever built. Any commercial success of the International machines is not attributable to the Steinbart patent.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter of this suit.

2. Plaintiff is owner of the title to the Steinbart patent No. 1,907,453, dated May 9, 1933, here in suit.

3. Claims 23 and 29 are invalid and void as directed to an obvious mechanical expedient applied to steel wool machines of the prior art.

4. Claims 23 and 29 are invalid and void as they are directed to the non-inventive extension of the idea of power-driving wire-loop forming pulleys which was old and well known in the kindred and analogous art of wire drawing.

5. Claims 17 and 34, which include the limitation that the wire is reduced to "attentuated" condition in a single passage of the wire, do not add anything

inventive to the substance of claims 23 and 29 and are invalid and void.

6. Claims 17 and 34 are invalid and void as directed to a mere multiplication of old instrumentalities.

7. Claims 17 and 34 are invalid and void for indefiniteness.

8. Defendant's battery of machines in which the wire is passed from one machine to another does not infringe claims 17 and 34.

9. Claims to commercial success are unwarranted and do not save the patent from the findings of invalidity.

10. The Bill of Complaint is dismissed and defendant shall recover its costs.

11. The Counterclaim is dismissed with prejudice. As plaintiff has not been subjected to any expense in connection therewith, costs as to the Counterclaim are denied.

A decree may be submitted in conformity herewith.